JOSEPH E. SEAGRAM & SONS, INC., TRANSFEREE, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5310–64.   Filed August 31, 1966.

*Josiah Willard* and *David Sachs*, for petitioner.
*Charles M. Greenspan* and *Irving Bell*, for respondent.

ATKINS, *Judge:* The respondent determined that petitioner is liable, as transferee of assets of the Calvert Distilling Co. (successor by merger to Julius Kessler Distilling Co., Inc.), for a deficiency in income tax for the taxable year ended July 31, 1959, in the amount of $360,466.80. The petitioner concedes that it is liable as transferee for any deficiency properly due, but contests the amount of the deficiency. The only issue for decision is whether liquor inventories which petitioner transferred to its subsidiary, Julius Kessler Distilling Co., Inc., in 1957 as a contribution to capital, were properly treated by the latter as acquisitions of inventory at the time of the transfer, under the last-in, first-out (LIFO) method of inventorying goods, or whether it should have treated such inventories as having been acquired at the times acquired by its parent.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is an Indiana corporation engaged in the business of distilling, blending, and bottling liquors, with its principal office at New York, N.Y. It is a wholly owned subsidiary of Centenary Distillers, Ltd., a Canadian corporation, which in turn is a wholly owned subsidiary of Distillers Corporation-Seagrams, Ltd., also a Canadian corporation.

The petitioner is transferee of the assets of the Calvert Distilling Co. (hereinafter referred to as Calvert) which was the successor by merger to Julius Kessler Distilling Co., Inc. (hereinafter referred to as Kessler). The petitioner is liable as transferee for any deficiency in income tax determined to be due from Calvert.

On August 1, 1935, a corporation known as Gallagher & Burton, Inc., was formed under the laws of the State of Kentucky to engage in the business of distilling, blending, and bottling liquors. It became a subsidiary of the petitioner in 1939. On September 30, 1956, Julius Kessler Distilling Co., Inc., an Indiana corporation which was also a subsidiary of the petitioner, was merged into Gallagher & Burton, Inc., and the latter's name was changed to Julius Kessler Distilling Co., Inc., which is the Kentucky corporation referred to herein as Kessler. Kessler filed its income tax return for the taxable year ended July 31, 1959, with the district director of internal revenue for the Manhattan District of New York.

Early in January 1957, it was decided that Edgar Bronfman, then a Canadian citizen, should be elected president of the petitioner. Bronfman did not become a U.S. citizen until March 9, 1959. The laws of Kentucky prohibit an alien from being an officer or director of a liquor company doing business in that State. (Ky. Rev. Stat. sec. 243.100(4)). The petitioner was licensed to do business in Kentucky and had operating assets there. Following discussions among the petitioner's officials as to how best to permit Bronfman to become petitioner's president without violating Kentucky law, it was decided that the petitioner should cease doing business in Kentucky, and that this should be accomplished by making a capital contribution of substantially all its assets in Kentucky to Kessler, its Kentucky subsidiary. The only purpose in making the corporate contribution was to accomplish the above objective. The decision to make the contribution was not made in expectation of, or for the purpose of obtaining, any tax benefit to either the petitioner or Kessler. It was contemplated at that time that the capital contribution would be permanent or indefinite in duration, and not a temporary transfer.

On January 24, 1957, Bronfman was elected president and a director of petitioner by its board of directors. On January 31, 1957, the petitioner made a capital contribution to Kessler of substantially all of its assets located in Kentucky. Such assets had a net book value of $17,500,000, and consisted of liquor inventories with an aggregate cost basis to petitioner of $13,780,453, and the petitioner's plant and other properties located in Louisville, Ky. On January 31, 1957, prior to the contribution, petitioner's liquor inventories had an aggregate cost basis of $52,773,881 and Kessler's liquor inventories had an aggregate cost basis of $6,256,261. On the same day, the petitioner ceased to do business in Kentucky and formally withdrew as a foreign corporation doing business in Kentucky. All alcoholic beverage licenses and permits held by the petitioner in Kentucky were terminated and Kessler was substituted as the holder of such licenses.

Prior to and at the time of the capital contribution by the petitioner to Kessler of liquor inventories and other property, Kessler used the

last-in, first-out (LIFO) method of inventorying liquor, pursuant to section 472, I.R.C. 1954. It maintained four LIFO inventory classification: Bulk-in-bond whisky; bulk-in-bond spirits; bulk whisky tax paid; and domestic case goods tax paid. These LIFO inventories were maintained in "layers" or increments, each layer consisting of a month's acquisition of each class of inventory. Its layers were priced by reference to the actual cost of the goods acquired in order of acquisition by month. The petitioner used the same LIFO inventory method as was used by Kessler, except that the petitioner maintained a fifth inventory classification: Bulk-in-bond gin. The capital contribution from petitioner to Kessler on January 31, 1957, included the inventories in all five classes. Kessler accounted for these contributed inventories in each of the five classifications as single acquisitions as of February 1, 1957, at the total cost of each class to the petitioner, without retaining the identity of the petitioner's LIFO layers or increments, and without integrating them into its own corresponding monthly LIFO layers. It included the entire amount of contributed inventory within each classification in its LIFO layer for that classification for February 1957. The cost for each gallon of each class of inventory acquired on January 31, 1957, was determined by Kessler by dividing the total cost to petitioner of all the gallons acquired within each class by the number of gallons acquired in each respective class.

After the above capital contribution, Kessler continued its previous business activities. It also continued the production which the petitioner had previously conducted in Kentucky in substantially the same manner as it had been previously conducted by the petitioner, but Kessler's name was used on barrels of bulk liquors, and the bottling of Seagram 7-Crown whisky was discontinued at the Louisville, Ky., plant. The nature of the blending operation was and is such that the distilling corporation does not necessarily use all its own distillates exclusively in its own labeled brands and, accordingly, frequently purchases distillates from and sells distillates to both affiliated and nonaffiliated companies to complete the blending process. Since the largest selling brands of the petitioner and its affiliated companies are those of "Seagram" and "Calvert," the major portion of the distillates produced at the Louisville, Ky., plant both before and after January 31, 1957, were used by or ultimately sold to the petitioner and sold to Calvert, and ultimately sold under these labels.

On November 28, 1958, the State of incorporation of Kessler was changed from Kentucky to Delaware. On November 30, 1958, Joseph E. Seagram & Sons, Inc., a Delaware corporation which was a subsidiary of the petitioner, was merged into Kessler.

On July 31, 1960, Kessler was merged into Calvert. Such merger had not been contemplated at the time of the capital contribution by petitioner of its Kentucky assets to Kessler in January 1957.[1] At the time of this merger there remained in the LIFO inventory accounts of Kessler an aggregate value of $10,771,466 of inventories which had been contributed to it by the petitioner on January 31, 1957, such amount being computed in accordance with Kessler's manner of treating the inventories so contributed by the petitioner.

On December 31, 1962, Calvert was dissolved and its assets were transferred to the petitioner. This dissolution was not contemplated at the time of the capital contribution of January 31, 1957. At the time of the dissolution of Calvert there remained in its LIFO inventory accounts an aggregate value of $10,771,466 of inventories which had been contributed by petitioner to Kessler on January 31, 1957, such amount being computed in accordance with Kessler's and Calvert's manner of treating the inventories so contributed by the petitioner.[2]

In the notice of deficiency the respondent determined that, pursuant to section 472 (a) and (b), I.R.C. 1954, and section 1.472-3(d), Income Tax Regs., Kessler should retain in its inventory records for tax purposes (for its taxable years ended July 31, 1957, 1958, 1959, and 1960) the identity of petitioner's LIFO layers or increments within each class of inventory and integrate such layers by date into the existing layers within each similar class of inventory held by Kessler both before and after the capital contributions. Such adjustment resulted in a decrease of $159,225 in the cost of goods sold by Kessler in the taxable year in question, namely, the taxable year ended July 31, 1959, and an increase in its taxable income for such year in the same amount. Such adjustment in the inventory accounts resulted in decreases in Kessler's cost of goods sold in its taxable years ended July 31, 1957, 1958, and 1960, in the respective amounts of $324,958, $84,979, and $186, and also resulted in net increases in its taxable income (and consequently in net decreases in its net operating losses) for such years in the same respective amounts. Such inventory adjustments by the respondent with respect to Kessler's taxable years ended July 31, 1957, 1958, and 1960, resulted in a reduction of the net operat-

---

[1] When it began operations the petitioner had a policy of organizing a separate distilling corporation and a separate selling corporation for each brand of whisky produced, such as Kessler, Seagrams, Calvert, and Four Roses. This resulted in a cumbersome corporate structure which the petitioner wanted to simplify. In 1954 the selling corporations were combined, but it was considered necessary in view of the existing regulations with respect to labeling distilled spirits, to maintain separate distilling companies in order to keep the brands entirely separate. It was not until Sept. 1, 1959, that Regs. No. 5, relating to Labeling and Advertising of Distilled Spirits, was amended to provide for the use of "any trade name shown on the distiller's permit * * * at the time the spirits were distilled, irrespective of the name under which they were actually distilled." It then became feasible to combine the distilling companies and still maintain before the public the separate brand labeling that was deemed desirable.

[2] The record does not disclose how the petitioner treated the acquired inventories.

ing loss deduction available to Kessler for its taxable year ended July 31, 1959, in the aggregate of $410,123.

OPINION

In accordance with section 362, I.R.C. 1954,[3] the basis of the liquor inventories contributed by the petitioner to Kessler remained the same in its hands as it was in the hands of the petitioner. However the petitioner contends that this does not require that Kessler treat such inventories as having been acquired by it at the times acquired by the petitioner. In other words, it is its contention that Kessler is not required to retain in its inventory records for tax purposes the identity of petitioner's LIFO layers or increments within each class of inventory contributed and integrate them into its own corresponding monthly layers within each similar class of inventory. Rather, it contends that under the LIFO method authorized by section 472, I.R.C. 1954,[4] the contributed inventory should be treated as "acquired" in the taxable year ended July 31, 1957. In this connection it points out that the statute makes no distinction between inventory acquired by production or purchase and inventory acquired in any other manner, such as by capital contribution.

The respondent on the other hand determined, and contends, that where, as here, both the petitioner and its subsidiary Kessler employed the same method of inventorying goods it should not be considered that the contributed inventory was "acquired" by Kessler in the taxable year ended July 31, 1957, but should be considered as having been acquired by Kessler at the times acquired by the petitioner.

As a general rule a corporation and its stockholders are deemed separate entities and this is true in respect to tax problems. *New*

---

[3] Sec. 362 of the Code provides:

(a) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If property was acquired on or after June 22, 1954, by a corporation—

(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

(2) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

[4] Sec. 472 of the Code provides, in pertinent part, as follows:

(a) AUTHORIZATION.—A taxpayer may use the method provided in subsection (b) * * * in inventorying goods specified in an application to use such method filed at such time and in such manner as the Secretary or his delegate may prescribe. The change to, and the use of, such method shall be in accordance with such regulations as the Secretary or his delegate may prescribe as necessary in order that the use of such method may clearly reflect income.

(b) METHOD APPLICABLE.—In inventorying goods specified in the application described in subsection (a), the taxpayer shall:

(1) Treat those remaining on hand at the close of the taxable year as being: First, those included in the opening inventory of the taxable year (in the order of acquisition) to the extent thereof; and second, those acquired in the taxable year;

(2) Inventory them at cost; and

(3). Treat those included in the opening inventory of the taxable year in which such method is first used as having been acquired at the same time and determine their cost by the average cost method.

*Colonial Ice Co.* v. *Helvering*, 292 U.S. 435, and *Burnet* v. *Commonwealth Improvement Co.*, 287 U.S. 415. While the Government may look at actualities and either recognize or disregard the corporate form where such corporate form is unreal or a sham (*Higgins* v. *Smith*, 308 U.S. 473), so long as the corporation is organized for a business purpose or is carrying on business activity, it remains a taxable entity separate from its shareholders. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436; and *National Investors Corporation* v. *Hoey*, (C.A. 2) 144 F. 2d 466. In the instant case both the petitioner and Kessler were carrying on business activity and were recognized as separate taxable entities by the respondent. We must, therefore, view the petitioner and Kessler as entirely separate entities. We must also accept the transaction between them at face value unless it was a sham or in substance something other than what it purported to be. The evidence clearly establishes that the transfer of the inventory was not intended as a mere temporary transfer. By the same token, it did not constitute a step in an integrated transaction having as its purpose the later recovery of such inventory by the petitioner. The evidence also clearly establishes, and we have found as a fact, that the transaction was not entered into for the purpose of gaining a tax benefit for either the petitioner or Kessler. In these circumstances we cannot accept the respondent's view that it should be considered that Kessler acquired the inventories at the times they were acquired by the petitioner. Rather, we think it must be concluded that Kessler "acquired" the inventories, within the contemplation of section 472(b), at the time of the contribution.

Section 381 of the Code [5] does not support the respondent's position.

---

[5] Sec. 381, dealing with "Carryovers in Certain Corporate Acquisitions," provides in pertinent part, as follows:

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b) (2) ; or

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) (but only if the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met), or (F) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) ITEMS OF THE DISTRIBUTOR OR TRANSFEROR CORPORATION.—The items referred to in subsection (a) are:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(5) INVENTORIES.—In any case in which inventories are received by the acquiring corporation, such inventories shall be taken by such corporation (in determining its income) on the same basis on which such inventories were taken by the distributor or transferor corporation, unless different methods were used by several distributor or transferor corporations or by a distributor or transferor corporation and the acquiring corporation. If different methods were used, the acquiring corporation shall use the method or combination of methods of taking inventory adopted pursuant to regulations prescribed by the Secretary or his delegate.

That section provides that upon the acquisition of inventories of a corporation by another corporation in certain liquidations of subsidiaries and in certain reorganizations such inventories shall in general be taken by such corporation on the same basis on which such inventories were taken by the distributor or transferor corporation. However, such section makes no reference whatever to acquisitions of inventory by way of a contribution to capital or in a transaction of the type described in section 351 of the Code (namely, a transfer, in exchange for stock or securities, to a corporation controlled by the transferor). In the congressional committee reports in connection with section 381, I.R.C. 1954, it was made clear that section 381 was not intended to affect the carryover treatment of items or tax attributes in corporate transactions not specifically mentioned in the section,[6] and that no inference is to be drawn from the enactment of section 381 with respect to whether, in other situations, any item or tax attribute is to be given carryover treatment. Nor are there any other specific statutory provisions or regulations [7] with respect to the manner of treating inventories contributed by a corporation to its subsidiary.

A case not precisely in point, but which we consider governing in principle, is *Textile Apron Co.*, 21 T.C. 147. In that case the taxpayer, in a tax-free exchange under section 112(b)(5), I.R.C. 1939 (predecessor to sec. 351 of the 1954 Code), acquired the business and all the assets, including inventories, of three proprietorships owned by the same person. The three proprietorships had used the LIFO method of inventorying goods, and the taxpaper claimed the right to carry over the transferors' LIFO method of inventorying goods. In that case we held that since the taxpayer had failed to file an application to use the LIFO method it was required to use the first-in, first-out method of inventorying goods. In so holding we stated in part:

Since the petitioner was under no obligation to use the same method of computing costs as that employed by its predecessors, it is obvious that permission granted to its predecessors on the basis of stated methods of cost computation

[6] H. Rept. No. 8300, 83d Cong., 2d Sess., p. A135, and S. Rept. No. 1622, 83d Cong., 2d Sess., p. 277, each states in part:
"The section is not intended to affect the carryover treatment of an item or tax attribute not specified in the section or the carryover treatment of items or tax attributes in corporate transactions not described in subsection (a). No inference is to be drawn from the enactment of this section whether any item or tax attribute may be utilized by a successor or a predecessor corporation under existing law."

[7] In this connection, it may be pointed out that at the present time there is a proposal (25 Fed. Reg. 13914 (1960)) to adopt a regulation (sec. 1.381(c)(5)-1(e)(2), Income Tax Regs.) which states in part that where an acquiring corporation is required or permitted to use the last-in, first-out method the base-year inventories and any layers of increment for such inventories prior to the date of the transaction must be retained. However, such proposed regulation has reference to only transactions of the type described in sec. 381.

should not extend to the petitioner, who was free to employ an entirely different method of cost computation.

The petitioner argues that since it was required, as a transferee in a 112(b)(5) tax-free exchange, to record its opening inventory in 1946 at the transferor's basis,[4] it was also required to use the transferor's method of valuing inventories. This is clearly not the case. The transferor's method of computing inventory valuation had no continuing effect on the petitioner. It merely served as a means of determining the basis of the transferred assets.[5] * * * [Footnotes omitted.]

Similarly here, since Kessler was an entity separate from the petitioner, the latter's method of computing inventories, including its computation of layers of LIFO inventory, had no continuing effect upon Kessler. It should be added that for present purposes we see no essential difference between the acquisition of inventory in a tax-free exchange such as was involved in the *Textile Apron Co.* case and the acquisition of inventory by contribution such as is involved in the instant case.

In view of the foregoing we conclude that Kessler is not required to retain in its inventory records the identity of petitioner's LIFO layers or increments within each class of inventory contributed to it by petitioner and integrate them into its own corresponding monthly layers of inventory, as determined by the respondent.

The respondent contends that Kessler's method of treating the contributed inventory resulted in a distortion of income, pointing out that Kessler was a subsidiary of the petitioner, that both Kessler and the petitioner employed the LIFO method of inventorying goods, that in 1962 the petitioner reacquired approximately 78 percent of the inventory originally contributed by it to Kessler (although conceding that this ultimate result was not contemplated when the contribution was made), and that Kessler was thus able to inflate its cost of goods sold. He refers to the provision of section 472(a) of the Code which states that the use of the LIFO method shall be in accordance with such regulations as the Secretary or his delegate may prescribe as necessary in order that the use of such method may clearly reflect income, and to section 1.472–3(d), Income Tax Regs., which states "the propriety of all computations incidental to the use of such method [LIFO], will be determined by the Commissioner in connection with the examination of the taxpayer's returns," and contends that he was justified in requiring Kessler to retain in its inventory record the identity of the petitioner's LIFO layers or increments within each class of inventory contributed and integrate them into its own corresponding monthly LIFO layers. However, in view of our conclusion that, within the meaning of section 472(b) of the Code, Kessler "acquired" the contributed inventory in its taxable year ended July 31, 1957, we think that its treatment of the contributed inventory did not distort its income.

*Decision will be entered under Rule 50.*