154

## THOR POWER TOOL COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4795-69.    Filed May 6, 1975.

*Mark H. Berens, Lee N. Abrams,* and *John E. Allen,* for the petitioner.

*Seymour I. Sherman,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income tax as follows:

| Taxable year | Deficiency |
|---|---|
| 1963 | $545,997.64 |
| 1965 | 59,701.35 |

The deficiency for the taxable year 1963 results primarily from a disallowance in full of a net operating loss deduction carried back from the taxable year 1964. Adjustments to the taxable year 1964 are, therefore, involved herein. Certain adjustments in the statutory notice of deficiency have been resolved by the parties leaving the following issues for decision:

(1) Where the petitioner valued its inventory at the lower of cost or market, did the Commissioner abuse the discretion vested in him under section 471,[1] I.R.C. 1954, by reducing the petitioner's cost of goods sold and restoring to income the amount by which the petitioner reduced the value of its 1964 closing inventory to reflect the current net realizable value [2] rather than current replacement cost of units of inventory determined to be excess under procedures in accordance with generally accepted accounting principles?

(2) In computing petitioner's cost of goods sold for the taxable year 1964, did the Commissioner abuse the discretion vested in him under section 471, I.R.C. 1954, by disallowing an addition of $22,090 in the taxable year 1964 to a reserve for inventory valuation account (which addition decreased ending inventory and increased cost of goods sold) to provide for reduction in the value of inventory replacement parts and accessories stocked for tools no longer manufactured by petitioner?

(3) Did the Commissioner abuse the discretion vested in him under section 166(c), I.R.C. 1954, by disallowing a portion of petitioner's addition to its reserve for bad debts for the taxable year 1965?

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by reference.

Petitioner Thor Power Tool Co. is a corporation organized under the laws of the State of Delaware. At the time the petition was filed and during the years in controversy, its principal office and place of business was in Aurora, Ill. Its corporate income tax returns for the taxable years 1960 to 1965, inclusive, were filed with the District Director of Internal Revenue, Chicago, Ill.

During 1964, petitioner (exclusive of its foreign subsidiaries) operated 4 manufacturing plants and 23 sales and service branches in the United States and 1 branch in Canada. It manufactured hand-held power tools, parts, and accessories for industrial, contractor, service trades, and household uses in three plants located at Aurora and LaGrange Park, Ill., and Los

[1] Unless otherwise noted, all Code section references are to the Internal Revenue Code of 1954 in effect during the taxable years in issue.

[2] "Net realizable value" consists of the estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal. Accounting Research Bull. No. 43, p. 31 (1961).

Angeles, Calif. (collectively the Tool Division). A fourth plant at Cincinnati, Ohio (the Rubber Division), manufactured products such as rubber-covered rolls, belts, specialty hose, and molded rubber articles. The sales and service branches were engaged in sales of power tools, parts, and accessories, and service of power tools; they did not handle rubber products.

The three manufacturing plants of the Tool Division maintained inventories of (i) raw materials; (ii) work-in-process; (iii) finished parts (for use in production of tools and for sale as service parts) and accessories; and (iv) completed tools. The manufacturing plant of the Rubber Division maintained inventories of raw materials, work-in-process, and completed products. The sales and service branches maintained inventories of service parts, accessories, and completed tools. In addition, some of petitioner's distributors and some of its large industrial customers maintained their own stocks of service parts. The record does not disclose the extent of such inventories nor the effect they might have had on the petitioner's ability to liquidate its own inventories.

At all pertinent times prior to 1964, petitioner's inventory was valued on the basis of the lower of cost or market. Petitioner's income tax returns from 1964 to 1970 indicated that inventory continued to be valued on that basis.

From time to time, petitioner discontinued the production of certain tools but maintained an inventory of replacement parts and accessories for such tools. In 1960, petitioner opened an inventory contra account entitled, "Reserve for Inventory Valuation" (RIV). The RIV account was created for the purpose of reducing the value of closing inventory each year to reflect the value of replacement parts and accessories for tools no longer produced by petitioner.

On December 31, 1960, the RIV account was credited with $116,244.52, effecting a 100-percent writeoff of parts and accessories for tools which went out of production during and prior to 1950, a 90-percent write-down of parts and accessories for tools which were discontinued in 1951, 80 percent for 1952, et cetera, with corresponding partial write-downs for the amortization of parts and accessories for tools discontinued between 1953 and 1958 and a 10-percent write-down of parts and accessories for tools which went out of production in 1959. The effect of such a procedure was to amortize the cost of inventory of

such parts and accessories over a 10-year period. An additional credit of $30,966.35 was made to the account in 1961 resulting in a balance in the RIV account on December 31, 1961, of $147,210.87. On December 31, 1963, the balance of the account was $152,117. During the first three quarters of calendar year 1964, $22,090 was added (credited) to the RIV account resulting in a balance of $174,207 as of September 30, 1964.

The credit balance in the RIV account at the end of each year was reflected on petitioner's income tax return for that year as a reduction of closing inventory. Therefore, the net addition to the RIV account during any particular taxable year increased petitioner's cost of goods sold and reduced its taxable income for that year.

In August 1964, Stewart-Warner Corp., which then owned approximately 20 percent of petitioner's outstanding common stock, entered into an agreement with petitioner to purchase substantially all of petitioner's assets. As a result of an investigation and audit conducted incident to this purchase agreement, Stewart-Warner concluded that petitioner's assets were substantially overstated and its liabilities understated. The purchase agreement was rescinded by mutual agreement in early December 1964, at which time Stewart-Warner agreed to provide management assistance to petitioner.

New management concluded that existing inventory quantities were excessive. Prior management had reflected inventory at its full value, including portions of the inventory which new management viewed to be in excess of anticipated market demand.

Incident to closing the books and preparing the financial statements as of December 31, 1964, petitioner's new management undertook an analysis of its closing inventory. A physical inventory was taken at all factories and branches. Various amounts were written off or written down, including a complete writeoff of inventory deemed obsolete. The remaining items of inventory consisted of the following:

| | |
|---|---:|
| Raw materials _____ | 4,297 |
| Work-in-process_____ | 1,781 |
| Finished parts (service and production) and accessories _____ | 33,670 |
| Finished tools _____ | 4,344 |
| Total number of inventory items_____ | 44,092 |

Because of the large number of remaining inventory items and the relatively small quantity or low value of each item, petitioner's new management concluded that it was impractical to try to determine precisely how many units of each item would be sold or used. Based on its experience in the manufacturing business, its familiarity with inventory problems of manufacturing companies, and its review of the situation, petitioner's new management employed two procedures in determining units of inventory in excess of anticipated demand.

Where such information was available, under the first procedure the demand for each item of inventory in 1965 and later years was forecast in terms of 1964 sales or "usage." [3] Employing an aging schedule, gross usable inventory was then reduced as follows:

(1) Items not in excess of 12 months' anticipated demand were not written down.

(2) Items in excess of 12 months' anticipated demand but not in excess of 18 months' anticipated demand were written down 50 percent.

(3) Items in excess of 18 months' anticipated demand but not in excess of 24 months' anticipated demand were written down 75 percent.

(4) Items in excess of 24 months' anticipated demand were completely written off.

The mechanics used to forecast future requirements of the inventory items can best be illustrated by the following which shows the percentage writeoff of units of hypothetical items A, B, C, D, and E. One hundred units of each item were on hand at December 31, 1964, but the number of units sold or used in 1964 varied from 20 to 100.

---

[3] For finished tools, usage was based on 1964 sales; for finished parts and accessories, usage was based on 1964 sales of service parts, and for parts incorporated in tools, usage was based upon 1964 production; for raw materials and work-in-process, usage was based on 1964 production.

|  | | | ANTICIPATED DEMAND | | | | |
|---|---|---|---|---|---|---|---|
| Item | Units on hand at 12/31/64 | Units sold or used in 1964 | 0-12 Months | 13-18 Months | 19-24 Months | +24 Months | Percent of write-down |
| A | 100 | 20 | 20 | 10 | 10 | 60 | |
| | | | 0% | 50% | 75% | 100% | |
| | | | 0 | 5 | 7.5 | 60 | =72.5% |
| B | 100 | 40 | 40 | 20 | 20 | 20 | |
| | | | 0% | 50% | 75% | 100% | |
| | | | 0 | 10 | 15 | 20 | =45.0% |
| C | 100 | 60 | 60 | 30 | 10 | 0 | |
| | | | 0% | 50% | 75% | 100% | |
| | | | 0 | 15 | 7.5 | 0 | =22.5% |
| D | 100 | 80 | 80 | 20 | 0 | 0 | |
| | | | 0% | 50% | 75% | 100% | |
| | | | 0 | 10 | 0 | 0 | =10.0% |
| E | 100 | 100 | 100 | 0 | 0 | 0 | |
| | | | 0% | 50% | 75% | 100% | |
| | | | 0 | 0 | 0 | 0 | =0.0% |

The second procedure employed by the new management was used to eliminate the cost of excess inventory at petitioner's LaGrange Park and Cincinnati plants, because the data showing the number of units used at those locations was not adequate to permit an accurate forecast of future requirements. Petitioner's management concluded that additional write-downs were necessary to reflect the net realizable value of its inventories at those two plants as follows: (i) 5 percent for tool parts and motor parts at LaGrange Park; (ii) 10 percent for raw material, work-in-process, and finished goods at Cincinnati, and raw material, manuals and name plates, and work-in-process at LaGrange Park; and (iii) 50 percent for hardware at LaGrange Park.

Petitioner then combined the amounts of write-down of the inventory determined by application of the two procedures described above. It did not reduce the balance in the inventory account by that amount; but, instead, entered that sum as a credit to the RIV account. The closing balance of the account on December 31, 1964, was $1,079,069 representing a net increase of $926,952 over the closing balance of the account on December 31, 1963. The December 31, 1964, balance in the RIV account resulted from the following: (i) The prior closing balance as of December 31, 1963, of $152,117, representing net additions from 1960 to 1963, inclusive, for amortization over a 10-year period of

parts and accessories stocked for tools no longer produced; (ii) interim additions for the same purpose for January 1, 1964, to September 30, 1964, in the amount of $22,090; (iii) $744,030 in excess inventory determined by application of procedure 1, outlined above; and (iv) $160,832 in excess inventory determined by application of procedure 2, outlined above.

In the statutory notice of deficiency, the Commissioner reduced petitioner's 1964 net operating loss with the following explanation:

The deduction of $22,279,949.71 claimed for cost of goods sold is disallowed to the extent of $1,079,069.00 representing writedown of inventory due to anticipated losses because it has not been established that such amount constitutes an allowable deduction under section 162 or any other section of the Internal Revenue Code of 1954.

The adjustment did not take into account the 1964 opening balance in the RIV account in the amount of $152,117 which represented total additions claimed on prior returns. Respondent concedes that the adjustment to 1964 is excessive to the extent of such opening balance. The net adjustment to taxable year 1964 remaining in issue is, therefore, $926,952 consisting of $744,030 and $160,832 added to the RIV account as of December 31, 1964, to reflect excess inventory and $22,090 in additions to the RIV account during the first three quarters of calendar year 1964 to reflect the amortization of parts and accessories stocked for tools no longer manufactured.

At the end of each year since 1964, petitioner has reduced its ending inventory for excess items using the first procedure described above. In order to correct what it believed to be partially inaccurate results derived from application of the first procedure, management further adjusted the value of ending inventory resulting in a $6,802 decrease in taxable income in 1970 and a $97,373 increase in taxable income in 1971.

Since late 1964, petitioner's management has not attempted to sell at reduced prices its excess parts, which comprised in each year from 70 percent to 82 percent of the excess inventory costs. The market for such parts was confined to owners of the related tools who purchased replacement parts when and if needed and would not buy parts not needed merely because of price reductions.

Petitioner reduced prices on some finished tools where management believed that price reductions would stimulate suf-

ficient additional sales to increase its gross income. Most of the finished tools in excess supply, however, were specialized products, and petitioner's management concluded that their potential market was so limited that a price reduction would not stimulate additional sales to increase gross receipts above what they would be if the salable quantities were sold at current prices. The record does not reflect prices, dates, quantities, or other relevant details of such efforts.

Petitioner's management concluded that the only secondary market for excess work-in-process (consisting of partially completed parts or tools) was as scrap. Petitioner attempted to sell excess raw materials in 1964, but these efforts met with very little success because users of such hardware items as nuts, bolts, screws, and washers prefer to purchase them from an established supplier, who can be relied upon to furnish the items according to specifications and to warrant their quality, rather than from another manufacturer disposing of surplus in a secondary market. The record does not reflect prices, quantities, or other relevant details of such efforts.

Of the $1,079,069 balance in the RIV account at December 31, 1964, $846,960 related to inventories at Aurora, Los Angeles, and the 23 sales and service branches. Dispositions of such inventory as scrap during the period 1965 through 1971, at the Aurora and Los Angeles factories only, amount to about 78 percent of the total inventory reserve provided for those two factories and the sales branches. Data on scrap dispositions at petitioner's branches was not presented.

Petitioner's closing inventory at December 31, 1964, contained items which, in the opinion of petitioner's management, were unsalable in the normal course of business because they were in excess of reasonably foreseeable demand. Generally accepted accounting principles required that petitioner reduce the value of its inventory to its net realizable value by eliminating the cost of such excess items. If petitioner had failed to reflect such a reduction on a reasonable basis, an independent certified public accounting firm auditing its books would have been unable to issue an unqualified opinion certifying that petitioner's financial statements had been prepared in accordance with generally accepted accounting principles. The procedures utilized by petitioner's management to reduce the value of its 1964 closing inventory, and in particular the procedures it used for

eliminating the cost of excess stock, were consistent with the generally accepted accounting principle of stating inventories at the lower of cost or market, and resulted in petitioner's stating the inventory in issue at its estimate of current net realizable value.

Petitioner made no effort to determine the purchase or reproduction cost as of December 31, 1964, of each item of inventory which it determined to be excess nor was any effort made to determine the market value of each article on hand at the inventory date. Units of a given item of inventory were essentially fungible. There was no segregation or earmarking of specific units and no distinction was apparent between specific units so as to distinguish those carried at full value from those written down or written off.

At all times pertinent hereto, petitioner has utilized the reserve method for claiming losses from bad debts. For the taxable year 1965, it claimed an addition to its reserve for bad debts in the amount of $136,150, in order to bring the balance of the reserve at yearend to $228,947.60.

In computing the addition to its reserve for the taxable year 1965, petitioner treated all intercompany accounts as fully collectible. The accounts receivable from unrelated parties at the Cincinnati Rubber Division were reviewed by personnel familiar with them. This review indicated that two accounts were uncollectible, and a 100-percent reserve was set up for them. A 1-percent reserve was set up for the remaining receivables of the Cincinnati Rubber Division.

The accounts receivable of petitioner's Tool Division were analyzed by the credit clerks responsible for those accounts. All individual accounts which had balances exceeding $100 and were more than 90 days past due were specifically evaluated as to collectibility, account by account. A 100-percent reserve was set up for those accounts which the credit personnel determined were wholly uncollectible, and for an identical ratio of the accounts which had balances of less than $100 and were more than 90 days past due. Judgments made by the credit clerks responsible for the particular accounts were reviewed by the credit manager having supervision over the clerk involved, and subsequently by petitioner's treasurer. A reserve of 2 percent was set up for accounts from 30 to 90 days past due as well as those accounts over 90 days past due which were not treated as wholly

uncollectible. A reserve of 1 percent was set up for accounts which were less than 30 days past due. Finally, petitioner's president conducted an overall review of the accounts receivable and approved the proposed reserve provision.

In the statutory notice of deficiency, the Commissioner disallowed $74,790.80 of the $136,150 claimed by petitioner as an addition to the bad debt reserve for the taxable year 1965. In computing the adjustment to the reserve for bad debts, respondent divided the total amount of accounts written off from 1960 through 1965 ($940,413) by the total of yearend receivables for those 6 years ($30,063,802) to arrive at a factor of 3.128 percent. He then applied this percentage to the petitioner's receivables at December 31, 1965 ($4,927,967), resulting in a figure of $154,156.80 (which is $10 too high due to a mathematical error), which respondent determined represented the allowable reserve as of that date. This amount was subtracted from the December 31, 1965, balance in the reserve account of $228,947.60 to reach the $74,790.80 adjustment.

OPINION

The Commissioner disallowed petitioner's write-down of its ending inventory for the taxable year 1964 in the amount of $1,079,069, which adjustment is now conceded to be $926,952. The statutory notice of deficiency described the adjustment to inventory affecting cost of goods sold as disallowable under section 162 or any other section of the Internal Revenue Code.

Cost of goods sold is not allowable under section 162 and petitioner need not prove that an increase in cost of goods sold is allowable under section 162. *Lela Sullenger*, 11 T.C. 1076 (1948). Cost of goods sold is an offset to gross sales. Sec. 1.61-3(a), Income Tax Regs.; cf. *Burnet v. Logan*, 283 U.S. 404 (1931); *Doyle v. Mitchell Brothers Co.*, 247 U.S. 179 (1918).

Although cost of goods sold does not represent a deduction in the technical sense, such a description of the adjustment did not mislead or surprise petitioner as to the issue involved nor has petitioner demonstrated that the language of the statutory notice was in any way prejudicial. Petitioner cannot, therefore, be sustained due to the inappropriate description of the adjustment contained in the statutory notice of deficiency. *Standard Oil Co.*, 43 B.T.A. 973 (1941), affd. 129 F. 2d 363 (7th Cir. 1942), cert.

denied 317 U.S. 688 (1942); *Luke v. Commissioner*, 351 F. 2d 568 (7th Cir. 1965), affg. a Memorandum Opinion of this Court.

The adjustments to 1964 ending inventory which remain for our consideration consist of the following:

(1) A downward valuation of $744,030 due to excess items computed by petitioner based primarily on 1964 usage of the items;

(2) A downward valuation of $160,832 due to excess items based upon flat percentages applied to inventories at the LaGrange Park and Cincinnati plants where usage information was not available; and

(3) A downward valuation of $22,090 to reflect amortization of parts and accessories stocked for tools no longer manufactured by petitioner.

All three of the above-described procedures were employed by petitioner to reduce the value of the 1964 ending inventory to what petitioner considered to be the net realizable value. All three of the procedures were designed to write down the value because there were units on hand which management deemed to be in excess of the *future* needs of petitioner's business. There was no segregation of the inventory which management determined to be excessive.

The details of the procedures employed to compute the adjustments are described fully in our findings of fact. In summary, they may be described as follows:

(1) Petitioner assumed that future needs for each item would be the same as such needs during 1964 and determined how many months of supply thus remained on hand at December 31, 1964. The values of items on hand in excess of the forecast needs for 1 year were written down in varying percentages, depending upon the number of periods items were forecast to be used.

(2) Petitioner did not have adequate records to show the usage in 1964 of various items of inventory at its LaGrange and Cincinnati plants. Therefore, it applied arbitrary percentages in writing down specified classifications of inventory; i.e., raw materials, work-in-process, and finished goods.

(3) For the inventory of spare parts and accessories stocked for tools no longer manufactured by petitioner, it amortized the cost of such items over a 10-year period.

Respondent contends that the procedures which petitioner used to identify and value excess inventory pursuant to the 1964

write-down of such excess to net realizable value failed to clearly reflect income because such procedures were speculative, they were not sanctioned by the regulations, and would allow petitioner to circumvent annual accounting by anticipating or delaying losses which must be taken in the taxable year in which the event giving rise to the losses occurred, not the taxable year such losses are discovered. Alternatively, respondent argues that for purposes of section 446(e) of the Code, petitioner changed its method of accounting in the taxable year 1964, the year in which the first two procedures were initiated. Finally, should we hold for the petitioner on the first two theories, respondent asserts that annual accounting requires that the procedures applied to the ending inventory must be consistently applied to the beginning inventory in order to clearly reflect 1964 income.

Petitioner contends that there is no specific statutory authority contrary to the general requirements of sections 446 and 471 of the Code which require the valuation of inventory to be in accordance with generally accepted accounting principles and to clearly reflect income. Petitioner produced distinguished members of the accounting profession who testified that the inventory valuation methods employed by petitioner were in accordance with generally accepted accounting principles and thoroughly convinced us that such was the case. A write-down of inventory for excessive stock in this case was not merely desirable for accounting purposes, it was required in order to produce a certified balance sheet. Petitioner has, therefore, amply demonstrated that the write-down of inventory was in accordance with generally accepted accounting principles and within the term, "best accounting practice," as that term is used in section 471 of the Code and the regulations promulgated under that section. However, petitioner must also show that the method clearly reflects taxable income. *Photo-Sonics, Inc.*, 42 T.C. 926 (1964), affd. 357 F. 2d 656 (9th Cir. 1966).

Two sections of the Code are involved: section 446 [4] because the valuation of inventory constitutes a method of accounting

[4] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or *if the method used does not clearly reflect income,* the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. [Emphasis added.]

and section 471 [5] because that section grants authority to the Commissioner to prescribe the method for taking inventories. The sections will be discussed together because both contain the requirement that the inventory method must clearly reflect income.

Sections 446 and 471 impose a heavy burden of proof on petitioner. We described that burden as follows in *All-Steel Equipment Co.*, 54 T.C. 1749, 1761 (1970), affd. on this issue 467 F. 2d 1184 (7th Cir. 1972):

> The wording of sections 446(b) and 471 makes clear that, in matters of accounting methods, the respondent is invested with broad discretion. If a taxpayer's method of accounting does not clearly reflect income, the respondent may compute income "under such method as, in * * * [his] opinion * * * does clearly reflect income." Sec. 446(b). More specifically, section 471 provides that "inventories shall be taken * * * on such basis *as the Secretary or his delegate may prescribe* as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income." These provisions have been a part of our tax law for many years, and they have been interpreted as imposing an extremely heavy burden of proof on taxpayers challenging the respondent's determinations—the Supreme Court has gone so far as to require a showing that such determinations are"plainly arbitrary." *Lucas* v. *Structural Steel Co.*, 281 U.S. 264 (1930). See also *Photo-Sonics, Inc.* v. *Commissioner, supra; Finance & Guaranty Co.* v. *Commissioner*, 50 F.2d 1061 (C.A. 4, 1931), affirming 19 B.T.A. 1313 (1930); *Commissioner* v. *Joseph E. Seagram & Sons, Inc.*, 394 F.2d 738 (C.A. 2, 1968), reversing 46 T.C. 698 (1966). * * * [Emphasis supplied.]

Proof that the method is in accordance with generally accepted accounting principles does not also prove that the method clearly reflects income under the income tax law. *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961).

Petitioner does not challenge the validity of the applicable income tax regulations promulgated under sections 446 and 471. Instead, petitioner argues that the inventory valuation procedures it employed fit within the applicable regulations. [6]

---

[5] SEC. 471. GENERAL RULE FOR INVENTORIES.

Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and *as most clearly reflecting the income.* [Emphasis added.]

[6] Portions of the regulations expressing the general requirements of secs. 446 and 471 of the Code are as follows:

METHODS OF ACCOUNTING IN GENERAL
Sec. 1.446-1 General rule for methods of accounting.
(a) *General rule.* (1) Section 446(a) provides that taxable income shall be computed

Section 1.471-2(b), Income Tax Regs., was amended by T.D. 7285 (approved September 13, 1973), 1973-2 C.B. 163, after the briefs were filed in the instant case. The amendment deleted the following language:

An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, *as a general rule,* be regarded as clearly reflecting his income. [Emphasis added.]

The amendment added other language which will not be set forth here because we hold that the amendment to the regulations cannot be applicable to this case. *Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110 (1939). Moreover, our decision would be no different if the amendment to the regulations were applicable.

The foregoing general provisions of the Income Tax Regulations requiring that the method must clearly reflect income were not satisfied by the testimony of petitioner's witnesses. The test in the instant case as to whether the method used by petitioner clearly reflected its income for the taxable year 1964 involves other sections of the Income Tax Regulations which are more specific in nature. Petitioner must demonstrate that its inventory method satisfied the requirements of those sections.

Petitioner, prior to 1964, valued its inventory on the basis of the lower of cost or market and it contends that its valuation of

under the method of accounting on the basis of which a taxpayer regularly computes his income in keeping his books. The term "method of accounting" includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item. * * *

(2) It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. *However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income.* A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will *ordinarily* be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year. [Emphasis added.]

Sec. 1.471-2 Valuation of inventories.

(a) Section 471 provides two tests to which each inventory must conform:

(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and

(2) *It must clearly reflect the income.*

(b) It follows, therefore, that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order to clearly reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation *so long as the method or basis used is in accord with sections 1.471-1 through 1.471-11.* [Emphasis added.]

the ending inventory for 1964 was likewise valued under that method. To prevail in that contention, petitioner must show that its method came within the ambit of section 1.471-2(c) or section 1.471-4, Income Tax Regs.

Section 1.471-4, Income Tax Regs., provides as follows:

Sec. 1.471-4. Inventories at cost or market, whichever is lower.

(a) Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases—

(1) Of goods purchased and on hand, and

(2) Of basic elements of cost (materials, labor, and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process of manufacture for delivery upon firm sales contracts (i.e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, under which the taxpayer is protected against actual loss, which goods must be inventoried at cost.

(b) Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market.

(c) Where the inventory is valued upon the basis of cost or market, whichever is lower, the market value of each article on hand at the inventory date shall be compared with the cost of the article, and the lower of such values shall be taken as the inventory value of the article.

Substantially similar provisions have been included in the regulations since 1920. Art. 1584, Regs. 45. For purposes of section 1.471-4(a), Income Tax Regs., market has generally been held to mean replacement cost. *D. Loveman & Son Export Corp.*, 34 T.C. 776 (1960), affd. 296 F.2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962); *Cleveland Automobile Co. v. United States*, 70 F.2d 365, 369 (6th Cir. 1934), cert. denied 293 U.S. 563 (1934). However, under exceptional circumstances and provided all requirements are complied with, inventory may be valued under the provisions of section 1.471-4(b) or 1.471-2(c), Income Tax Regs.

Concerning the rationale underlying the lower of cost or market method of valuing inventory, in *D. Loveman & Son Export Corp., supra* at 798, we stated:

Whatever the defects of the lower of cost-or-market method in actual practice, its underlying theory, as stated in Finney and Miller, Principles of Accounting (Intermediate) (5th ed. 1958), is as follows (p. 251):

"The cost-or-market basis of inventory pricing conforms with an old rule of accounting conservatism often stated as follows: Anticipate no profit and provide for all possible losses. If market purchase prices decline, it is assumed that selling prices will decline with them; reducing the inventory valuation to market purchase price reduces the profit of the period when the cost price decline took place and transfers the goods to the next period at a price which will presumably permit the earning of a normal gross profit on their sale. If the market purchase price increases, the inventory is valued at cost so that a profit will not be anticipated."

Thus, the lower of cost or market method is a limited and acceptable exception to the principles of annual accounting which otherwise would preclude recognition of an unrealized loss. *Space Controls, Inc. v. Commissioner*, 322 F.2d 144 (5th Cir. 1963). Of course, that does not mean that closed transactions or identifiable events may not be required in order to establish or substantiate the value of inventory. Accordingly, the Commissioner's above-quoted regulations are understandably detailed and specifically prescribe the acceptable methods for determining market value.

It is undisputed that units not in excess of projected current usage are normal goods within the meaning of section 1.471-4, Income Tax Regs. Only units in excess of projected current usage were designated by petitioner as excess inventory and written down to net realizable value. The petitioner's method of determination of excess inventory splits individual items or articles into two or more classifications for purposes of valuation. See *Fruehauf Trailer Co.*, 42 T.C. 83, 106 (1964), affd. 356 F.2d 975 (6th Cir. 1966), cert. denied 385 U.S. 822 (1966). Yet, the excess units were otherwise indistinguishable from other units of the same item of inventory. See *D. Loveman & Son Export Corp.*, 34 T.C. 776, 799 (1960), affd. 296 F.2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962).

Petitioner concedes that an active market prevailed at December 31, 1964, the inventory date; therefore, petitioner does not argue that the inventory should be valued under section 1.471-4(b), Income Tax Regs. Instead, petitioner argues that, for purposes of section 1.471-4(a), the term "market" means

replacement or reproduction cost only "under ordinary circumstances." Petitioner contends that the excess inventory was an extraordinary circumstance. The record does not support such a contention. Instead, it shows that the acquisition or production of such slow-moving units was a recurring, ordinary, and necessary incident of manufacturing, marketing, and maintaining petitioner's products. Petitioner's use of the 10-year amortization of replacement parts and accessories for discontinued items began in 1960 and the practice will presumably continue because petitioner will likely cease manufacturing certain tools in the future. In addition, we think it is a fair inference from the record that petitioner's accumulation of excess inventory occurred over a period of several years.

Petitioner did not compare the replacement market value of each item with its cost to determine which was lower. Instead, it wrote down the value of the entire inventory applying arbitrary percentages. The percentages were based upon management's considered opinion as to its *ultimate salability.* We find the explanation of the percentages vague. If we were to approve a concept permitting a write-down of inventory based upon an otherwise unsupported opinion of the taxpayer as to its ultimate salability we would, within some unknown limits, permit the taxpayer to determine how much tax it wanted to pay for a given year. For obvious reasons, the percentages used by management in this case could not provide a guide for management to use in all cases. We cannot approve the percentages used in the write-down based upon the record before us. Accordingly, we hold that the three procedures utilized by petitioner in valuing its ending inventory for the taxable year 1964 do not come within section 1.471-4, Income Tax Regs.

Petitioner contends that its excess inventory comes within section 1.471-2(c), Income Tax Regs., which provides as follows:

Sec. 1.471-2. Valuation of inventories.

(c) The bases of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower. (For inventories by dealers in securities, see sec. 1.471-5.) Any goods in an inventory which are *unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes,* including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition, whether subparagraph (1) or (2) of this paragraph is used, or if such goods consist of raw materials or partly finished goods held for use or

consumption, they shall be valued upon a reasonable basis, taking into consideration the usability and the condition of the goods, but in no case shall such value be less than the scrap value. Bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date. The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made. [Emphasis added.]

Petitioner argues that its excess inventory comes within the description of items of unsalable inventory underscored in the quoted regulations above. Such an interpretation would require us to hold that the unsalability of excess inventory resulted from causes similar to those applicable to damaged goods, imperfections, shop wear, changes of style, or odd or broken lots. We disagree with petitioner. All of the terms used in the phrase describe the units of inventory themselves and describe differences which would distinguish those units of inventory from other units of inventory. Excess inventory is not so distinguishable. It is commingled with the other inventory and it is excessive not because of its physical characteristics but because of management's view as to future demand for it. See *Cleveland Automobile Co. v. United States*, 70 F.2d 365, 369 (6th Cir. 1934); *D. Loveman & Son Export Corp., supra.*

Inventory falling within the categories set forth in the regulations above are to be valued by reference to actual offerings of such goods within 30 days after the inventory date. Petitioner points out its inability to comply with the 30-day provision without forcing down the price of other normal units within an item. This further demonstrates that excess inventory is not includable in the term "other similar causes" discussed above. Any goods in an inventory which are unsalable at normal prices or not usable in the normal way because of damage, imperfections, shop wear, changes of style, or odd or broken lots, would not compete in the marketplace with normal goods. They would produce a lower price and would not force down the price of normal goods because the discount in the marketplace is due to the reason that such goods are inferior.

Whether the so-called "30-day rule" applies is, therefore, not dispositive of the issue. Petitioner cannot come within the terms of section 1.471-2(c), Income Tax Regs.

Petitioner cites as authority for its procedures several cases which we find not in point for the reasons stated below.

In *Space Controls, Inc. v. Commissioner*, 322 F.2d 144 (5th Cir. 1963), reversing and remanding a Memorandum Opinion of this Court, the Court of Appeals reversed us to permit the write-down of work-in-process claimed by petitioner. That case involved trailers being produced pursuant to a contract for a fixed unit price. It is not necessary to decide whether we will follow that case in our consideration of the instant case because it is factually distinguishable. The price at which the finished product would be sold was fixed and the Court of Appeals found that the value placed upon work-in-process satisfied the test of section 1.471-4(b) as to a market where the taxpayer has offered the goods at a price lower than the current price. Here, petitioner made no such offer nor could it predict with any degree of accuracy what the items of excess inventory would sell for on the market in the future. In the case of applying procedure No. 1, they predicted that an item of excess inventory not used within 2 years was worth nothing but it was not based upon a fixed price 2 years away.

Petitioner relies upon *S. G. Sample Co. v. Commissioner*, 23 F.2d 671 (5th Cir. 1928), in which the Court of Appeals reversed the Board of Tax Appeals because it precluded the taxpayer from showing that a 25-percent general inventory markdown represented a true market value. In the instant case, petitioner was permitted to offer any evidence it desired to demonstrate the propriety of the write-down. Its evidence fails to convince us of the reasonableness of the write-down.[7]

The District Court cases relied upon by petitioner are likewise inapplicable.

In *Wood & Ewer Co. v. Ham*, 14 F.2d 995 (D. Me. 1926), buyers for some of the departments in a retail store who were experts in market values took inventory and testified that the values used represented the market value. Such evidence was a far cry from the instant case where arbitrary discounts were used for broad categories of inventory with no explanation of the basis for the discounts.[8]

*Buck's Booterie v. O'Malley,* an unreported case (Neb. 1951, 43 AFTR 1341, 51-2 USTC par. 9449) was a jury case.

[7] *Gem Jewelry Co.,* a Memorandum Opinion of this Court dated Jan. 13, 1947.
[8] *Gem Jewelry Co., supra.*

*Fides Publishers Assn. v. United States,* 263 F.Supp. 924 (N.D. Ind. 1967), involved a concession on the part of the Government that a writeoff of unsalable inventory was proper to clearly reflect income. The taxpayer presented an accountant who testified as to the rate of writeoff and the Government produced no witness. The rate was based upon subsequent sales of items of the inventory. The rates used in the instant case were arbitrary and not explained other than being the opinion of management.

Petitioner cites four early cases of the Board of Tax Appeals.

*Lord Motor Car Co.,* 5 B.T.A. 818 (1926), involved an inventory of used cars. The taxpayer valued the cars at their cost less 25 percent to represent the costs of sale. The estimate was supported by evidence of subsequent sales at the prices used by the taxpayer. The percentages used by petitioner here were not reflected in the prices of actual subsequent sales. Instead, the percentages are unexplained theoretical discounts based upon 1 year's use of each item in procedure No. 1 and upon flat percentages without explanation in procedure No. 2.

No reasons are given for approval of the method used by the taxpayer in *Fred S. Stewart Co.,* 5 B.T.A. 436 (1926). The opinion merely approves the valuation method used by the taxpayer, presumably on the basis of the facts.

*May Lumber Co.,* 13 B.T.A. 62 (1928), involved a write-down of inventory for deterioration based upon years of actual experience. The Board allowed the write-down because it was based upon precise and accurate physical count and evaluation, not unexplained percentages used by petitioner herein.

*Justus & Parker Co.,* 13 B.T.A. 127 (1928), is likewise inapplicable. That case involved a careful itemized valuation of each item of inventory by employees of the taxpayer, not broad applications of percentages as we have here.

The cases cited by petitioner and distinguished above fail to convince us that petitioner's method of valuing inventory clearly reflected income for tax purposes. Our holding herein does not disapprove of the use of percentages, per se; it disapproves those used by petitioner herein.

Because we hold that the adjustments of $926,952 to ending inventory on December 31, 1964, did not result in a clear reflection of taxable income for petitioner's taxable year 1964, it follows that the Commissioner did not abuse the discretion granted him by section 471 of the Code by reducing petitioner's

cost of goods sold and restoring such amount to income. Alternative grounds relied upon by respondent will not be considered because we hold for him on the inventory issue for the reasons stated above.

Petitioner claimed a deduction of $136,150 as an addition to its reserve for bad debts for the taxable year 1965, which the Commissioner disallowed to the extent of $74,790.80. Petitioner's deduction was based upon analyses of its accounts receivable by its appropriate personnel. The reserve determined by the Commissioner was based upon an average of the taxable year 1965 and the preceding 5 years. The procedure adopted by the Commissioner is based upon *Black Motor Co.,* 14 B.T.A. 300 (1940), affd. on another issue 125 F.2d 977 (6th Cir. 1942).

An addition to a reserve for bad debts is permitted under the provisions of section 166(c) of the Code.[9] The applicable regulations are contained in portions of section 1.166-4, Income Tax Regs.[10]

Section 166(c) gives the Commissioner the discretion to adjust the reserve for bad debts. To prevail, petitioner must show that the Commissioner abused such discretion. Petitioner contends that the abuse occurred because the Commissioner based his determination upon past history rather than current data on collectibility.

The burden on petitioner was to show that the Commissioner's determination was arbitrary, not that petitioner's method was

---

[9] SEC. 166. BAD DEBTS.

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

[10] Sec. 1.166-4 Reserve for bad debts.

(a) *Allowance of deduction.* A taxpayer who has established the reserve method of treating bad debts and has maintained proper reserve accounts for bad debts or who, in accordance with paragraph (b) of sec. 1.166-1, adopts the reserve method of treating bad debts may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of deducting specific bad debt items.

(b) *Reasonableness of addition to reserve*—(1) *Relevant factors.* What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.

(2) *Correction of errors in prior estimates.* In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.

better. *Massachusetts Business Development Corp.*, 52 T.C. 946 (1969). Petitioner did not show that conditions at the end of 1965 would cause collection of accounts receivable to be less likely than in prior years. We infer from the entire record that collectibility was probably more likely at the end of 1965 than it was in at least some of the years upon which the Commissioner based his average because new management had been infused into petitioner.

We hold, therefore, that the Commissioner did not abuse his discretion under section 166(c) of the Code in disallowing petitioner's deduction for addition to its reserve for bad debts in the amount of $74,790.80 for the taxable year 1965.

*Decision will be entered under Rule 155.*