ALTEC CORPORATION, Transferee of the Assets of LTL Corporation, Transferee of the Assets of ARC Liquidating Corporation, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Altec Corp. v. Commissioner
Docket No. 6378-73.
United States Tax Court
T.C. Memo 1977-438; 1977 Tax Ct. Memo LEXIS 1; 36 T.C.M. (CCH) 1795; T.C.M. (RIA) 770438; December 29, 1977, Filed William A. Cromartie,John L. Snyder,Frank P. VanderPloeg, *3 Francis O. McDermott,Burton H. Litwin, and Douglas L. Barnes, for the petitioner. Seymour I. Sherman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent has determined that petitioner is liable as transferee of the assets of LTL Corporation, which, in turn, was transferee of the assets of ARC Liquidating Corporation (formerly Allied Radio Corporation) for the following Federal income tax deficiencies of ARC Liquidating Corporation: Taxable Year (Period) Ended
Deficiency
July 29, 1966
$ 533,758.90
July 28, 1967
81,056.00
December 31, 1967
1,043,954.00
Total
$1,658,768.90
Petitioner does not deny that it is the transferee of the assets of LTL Corporation or that LTL Corporation was the transferee of the assets of ARC Liquidating Corporation (formerly Allied Radio Corporation and hereinafter referred to as Allied). However, petitioner seeks review of the determined deficiencies in the latter corporation's income taxes and raises the following issues: 1. Whether amounts realized in the course of a section 337 [1]/ liquidation sale with respect to previously *4 expensed items should be included in Allied's income for its last taxable period. 2. Whether Allied could deduct certain expenses incurred in the course of the section 337 liquidation sale. 3. Whether respondent properly adjusted Allied's cost of goods sold by requiring for each of the taxable periods in question that the closing inventory reported by Allied for each such period be increased by amounts carried in various inventory reserve accounts. 4. Whether legal fees of $30,542.42 paid by Allied during the fiscal year ended July 28, 1967, were currently deductible expenses or nondeductible capital expenditures. 5. Whether respondent properly determined the amount of depreciation recapture recognizable to Allied pursuant to sections 1245 and 1250 for its last taxable period. The correctness of respondent's adjustments to net operating loss deductions claimed by Allied for its taxable periods ended July 28, 1967, and December 31, 1967, is dependent upon the resolution of the other issues herein. FINDINGS OF FACT *5 1. General Background
Petitioner Altec Corporation (hereinafter Altec or petitioner) was organized under Delaware law as LTV Ling Altec on October 20, 1967. Petitioner's name was changed to that which it now bears on April 27, 1972. At all relevant times, altec has maintained its principal place of business in Dallas, Texas. ARC Liquidating Corporation (formerly named Allied Radio Corporation and herein referred to as Allied), the taxpayer whose income tax liabilities are in controversy, was organized under Illinois law on July 21, 1928, and maintained its principal office and place of business in Chicago, Illinois. For its taxable years prior to and including 1964, Allied filed its Federal income tax returns on the accrual method of accounting, utilizing a fiscal year ending July 31. Allied thereafter adopted a 52-53-week taxable and fiscal year ending with the last week ending in July. Its fiscal year for bookkeeping purposes was divided into 13 periods of 4 weeks each, with the last such period consisting of 5 weeks in those years where necessary in order to maintain consistency with the fiscal year itself. Allied's Federal income tax returns were timely filed with *6 the District Director of Internal Revenue, Chicago, Illinois, for the taxable and fiscal years ended July 31, 1961, to 1964, inclusive, the taxable and fiscal years ended the last week of July 1965 to 1967, inclusive, and the final taxable and fiscal period July 29, 1967, to December 31, 1967. During the years in issue, Allied distributed and sold electronic and related products, parts, components, and equipment. Through its Knight Division (hereinafter Knight, a wholly owned subsidiary until liquidated and made a division in 1967), it also engaged in the development and sale of amateur radio kits. Allied carried on its business through mail-order sales, ten retail stores which it owned, an industrial division which sold on a national scale, and a dealer division. Allied's inventory consisted of thousands of separate items of electronic parts and equipment, which were purchased from numerous suppliers. Its products included the lines of major manufacturers, and it also distributed its own brand products, which were manufactured for it by others, under the names "Knight" and "Allied." Allied itself did no manufacturing. Allied issued two major catalogues annually, known as *7 "Electronics for Everyone" and "Industrial Electronics Catalogue." It also published approximately 14 mail-order paperback manuals on electronics subjects for beginners, and supplemented its annual catalogues from time to time with fliers and special sales books, such as a Christmas sale book. During the taxable year ended July 28, 1967, its then current mail-order catalogue, "Electronics for Everyone--1967," which was first mailed in August 1966, was supplemented by five additional sales books. 2. Liquidation Sale
A. General
On October 27, 1967, Allied's shareholders approved the following measures: (1) a plan of complete liquidation pursuant to section 337; (2) an agreement dated September 18, 1967, whereby Allied was to sell all of its assets, subject to all of its liabilities, to Altec in exchange for 992,800 shares of Altec common stock and cash in the amount of $5,666.60; and (3) a change in Allied's name from Allied Radio Corporation to ARC Liquidating Corporation. On or about October 20, 1967, Altec organized a wholly owned Delaware subsidiary under the name of Alvis Ward, Inc. (hereinafter referred to as Delaware), which name was subsequently changed to *8 Allied Radio Corporation. Shortly after Delaware's formation, all of Allied's assets were transferred to Delaware in fulfillment of its agreement of sale with Altec. Allied thereafter changed its name to ARC Liquidating Corporation and was liquidated. The transaction between Allied and Delaware was treated as a pooling-of-interests for accounting purposes; thus, Allied's assets, liabilities, and retained earnings were carried forward on the statements of the acquiring corporation at the same amounts as they had been carried on Allied's books at the time of the acquisition. Delaware continued to operate the former assets and business of Allied until April 13, 1970, when it sold such assets and business (except certain of its accounts receivable) to a Texas corporation known as Color Tile of Idaho, Inc. On May 3, 1970, Delaware changed its name to LTL Corporation, and on January 3, 1972, was merged into Altec. In October 1969, Delaware executed a Transferee Agreement, assuming liability for any income tax finally determined to be due from Allied for each of the taxable periods in controversy. B. Tax benefit recovery
Among the assets sold to Delaware were supplies, *9 drawings, tooling, and artwork, which had been developed by Knight's engineering department. The cost of these items had been previously deducted in Federal income tax returns of the seller. Delaware recorded the acquired Knight drawings, tooling, and artwork on its books in the amount of $623,700, and thereafter claimed deductions for depreciation of these items in its own returns and in consolidated returns filed with petitioner. Delaware did not record the acquired supplies on its books, and claimed no deduction with respect thereto either in its own returns or in the said consolidated returns. The negotiations between Allied and petitioner leading to the eventual acquisition of Allied's assets were brief and related primarily to the total price to be paid in shares of petitioner's stock. Values were not separately assigned to the various assets of Allied. However, in connection with the acquisition of Allied's assets, Ling-Temco-Vought, Inc., petitioner's parent corporation, caused an appraisal to be made of the assets and business of Allied, as of October 20, 1967, by Marshall and Stevens, Inc. (hereinafter M & S), independent appraisal consultants. The appraisal *10 by M & S was quite detailed, and the report includes more than 200 pages devoted to the valuation of specific assets, including the drawings, tooling, and artwork developed by Knight. Those assets which would be continued in use were valued on the basis of market value in continued use; assets which were to be disposed of were valued on the basis of orderly liquidation values. In its report, M & S determined that the foregoing drawings, tooling, and artwork developed by Knight had a reproduction cost of $1,015,000, and a market value in continued use in the amount of $623,700. M & S concluded that the total value of the equity in the Allied business acquired by Delaware was $21,448,085, as of October 20, 1967. Prior to the sale to petitioner, an effort had been made by Allied's management to sell either the total Knight operation or, alternatively, to sell its separate assets, including the drawings, tooling, and artwork. Richard Silberbach, who had been the research and development engineering manager and later became Knight's general manager, made a proposal to Allied with respect to the Knight division. This proposal, dated September 21, 1967, was for the purchase by Silberbach *11 of Knight's fixed assets for $41,500, its inventory for $571,500, and all rights to Knight's intangibles including name, design rights, tools, files, etc. No value was assigned to these intangibles in the proposal, the aggregate proposed purchase price being $613,000. However, this proposed transaction was never consummated, and Allied was not successful in disposing of the Knight operation or its assets prior to the sale of Allied's entire business, including Knight, to petitioner. C. Expenses--section 337 liquidation sale
Allied realized an overall net gain on the sale of its assets to Delaware. Under the provisions of section 337(a), $10,391,933 of such gain was not recognized. However, in its return for its final fiscal period, ended December 31, 1967, Allied reported the following income in connection with the sale of its assets: Depreciation recapture
$131,053
Recovery of bad debt reserve
$571,346
Investment credit recapture
$ 74,484
In addition, in the same return for its final fiscal period, Allied claimed a deduction for the following expenses incurred in connection with the sale of its assets, its liquidation, and otherwise: Payee
Amount
White, Weld & Co.
$150,000.00
Hoffman & Davis
150,000.00
Altschuler, Melvoin & Glaser
15,000.00
Hopkins, Sutter, Owen, Mulroy,
Wentz & Davis
34,596.06
Isham, Lincoln & Beale
11,688.61
Arthur Andersen & Co.
19,000.00
Rosenthal & Shanfield
4,100.00
Hoffman & Davis (travel expense)
433.60
Travel Expense
246.65
Total
$385,064.92
*12 Respondent disallowed such deduction on the ground that these expenses should be offset against the selling price of the assets so as to result in the reduction of the nonrecognized gain on the sale. 3. Inventory Adjustments
Allied carried in stock approximately 65,000 separate items of electronic parts which it purchased from approximately 600 suppliers. Portions of this inventory were subject to technological changes and changes in style. During all relevant periods Allied maintained its inventory on the basis of first-in, first-out (FIFO) and the lower of cost or market. Perpetual inventory records were not maintained. On the average, Allied's inventory turnover period was approximately 16 weeks, or slightly over three times per year. Allied took two physical inventory counts each year. To and including its 1964 fiscal year, Allied's yearend physical inventory was taken on July 31, the last day of the fiscal year. Commencing with the 1965 fiscal year, and for each of the periods at issue herein, the yearend physical inventory was taken approximately 4 to 8 weeks prior to the close of the fiscal year. In addition to the usual inventory account, Allied maintained *13 on its books three special inventory adjustment or "reserve" accounts as follows: Price Differences or Variances (PDV); Unidentified Attrition (UA); and Devaluation. In its taxable year ended July 28, 1967, Allied established a fourth "reserve" account with respect to inventory, "Overstock--Knight Division," and maintained this account as well during its taxable period ended December 31, 1967. Prior to its liquidation on April 7, 1967, Allied's subsidiary, Knight, had maintained an account entitled "Reserve for Overstock to Reflect Excess Inventory," and the dollar balance in that account, amounting to $104,541.12, was carried over to Allied upon Knight's liquidation. Book inventory was reflected in Allied's financial statements as of the close of any given taxable period at the actual inventory amount, less the balances in all of the foregoing reserve accounts. The balances in the foregoing reserve accounts of Allied at the end of its relevant taxable periods were as follows: Taxable Year or Period Ended
7/30/65
7/29/66
7/28/67
12/31/67
Price Differ-
ences or
Variances
(PDV)
$ 77,539.00
$251,665.40
$281,196.00
$ 364,773.00
Unidentified
Attrition
(UA)
88,432.00
111,662.68
94,522.00
173,419.00
Devaluation
397,824.00
508,008.88
458,580.00
542,930.00
Overstock--
Knight
Division
0
0
148,083.57
315,054.24
Total
$563,795.00
$871,336.96
$982,381.57
$1,396,176.24
*14 Respondent increased Allied's closing inventory and thereby decreased its cost of goods sold by the following amounts: TYE 7/29/66
TYE 7/28/67
TYE 12/31/67
$871,336.96
$111,045.58
$413,794.50 The adjustment for the taxable year ended July 29, 1966, consists of the total of the three inventory reserve balances as of the close of such taxable year. The adjustment for the taxable year ended July 28, 1967, consists of the difference between the total of the closing balances of the four reserve accounts over the total of the opening balances of those accounts for such taxable year. [2]/ The adjustment for the taxable period ended December 31, 1967, consists of the total net increase in the closing balances of the four accounts over the total opening balances for that taxable period. [3]
*15 A. Price Differences or Variances (PDV) Reserve
Allied established a standard cost system of inventory computations, as well as the related PDV account, beginning with its taxable year ended July 30, 1965. The standard cost system was adopted in order to avoid hundreds of thousands of calculations required to compute actual costs of specific inventory items on hand. [4]/ Under this system, inventory items were priced at the predetermined "standard" cost for each item. The standard costs assigned represented estimates of the current and future replacement costs of the respective inventory items as determined by Allied's buyers, rebuyers, and merchandise managers. Allied conducted a physical inventory between 4 and 8 weeks prior to the close of each of the fiscal periods in issue. This inventory was initially valued at the standard cost in effect *16 at the time of the physical count ("old standard"). At the same time "new standard" costs were determined for the various inventory items, based upon their anticipated replacement costs. In instances where the new standard cost was lower than the old standard for an item, the yearend inventory value for such item was adjusted downward to the new standard ("minus price variances"). In instances where the new standard cost was higher than the old standard an adjustment would be made increasing the old standard inventory by the amount of the difference ("plus price variances"). Plus price variances were recorded as of the end of the fiscal year by a debit to the closing inventory account and a credit in an equal amount to the PDV account. The resulting yearend PDV account was treated as an inventory reserve. Mechanically, the balance in the inventory account, including those items as to which plus price variances existed, was equal to the new standard cost, but such inventory value was simultaneously reduced by the balance in the PDV account. The effect of the foregoing was to eliminate from the net inventory value the amount of the plus price variance. The yearend balance in *17 the PDV account was thereafter amortized by charges to cost of sales in equal installments in each of the first four 4-week periods of the following fiscal year. B. Unidentified Attrition (UA) Reserve
Because much of its inventory was easily pocketable and readily salable, Allied's inventory was subject to theft, and Allied in fact incurred inventory shortages due to theft, as well as breakage and clerical errors. Thefts resulted from shoplifting in its retail stores, internal theft, collusive theft between receiving men and truckers, and Post Office theft. Also, inventory stored at one of Allied's buildings located in a slum area was subject to unexplained shortages. It was Allied's practice, beginning in the fiscal year ended July 30, 1965, to make monthly charges to its Cost of Sales account in order to reflect monthly estimated inventory losses and shrinkages. These monthly charges would be credited to an account known as "Unidentified Attrition" (UA), which was a reserve, or contra-account, to the inventory account. Allied took inventory twice a year, usually in January, midway through the fiscal year, and in June, within 4 to 8 weeks prior to the fiscal yearend. *18 When the latter physical inventory was taken, the then balance in the UA account (representing the cumulative estimated inventory loss) was reversed by a credit to Cost of Sales, and the actual cumulative inventory shortage, determined through the two annual physical counts, was charged to Cost of Sales. In addition to the foregoing adjustments, as of the end of the fiscal year, an estimate would be made of the inventory loss between the actual physical inventory date and the end of the fiscal year, a 4- to 8-week period. In each of the taxable periods in controversy this amount was computed by Allied as a percentage of its sales for that interim period. The amount so computed became the new balance in the UA account as of the close of the fiscal year. For the taxable year ended July 30, 1965, a $607,015 shortage was determined at the time of the physical inventory in January 1965. When the second inventory of the fiscal year was taken on June 25, 1965, an additional shortage of $315,878 was identified, making a total shortage for the taxable year, as determined by actual physical inventory count, of $922,893. Using the method previously described, Allied adjusted *19 its cumulative UA reserve balance, based upon the actual loss determined, and set up a new yearend reserve balance of $88,432, as of July 30, 1965, such balance representing Allied's estimate of the shortage for the 5-week period between the physical inventory of June 25, 1965, and the fiscal yearend. In its fiscal 1965 return, Allied's cost of goods sold thus reflected both the $922,893 shortage revealed by physical inventories, and the estimate of $88,432 for the final 5-week period. An interim physical inventory was taken by Allied on January 14, 1966, the middle of the succeeding taxable year. This physical inventory disclosed a shortage of $499,765. On June 24, 1966, a second physical inventory was taken by Allied for that year, and an additional shortage of $175,908 was recognized. Thus, the total inventory shortage for the year amounted to $675,673, which total was charged to Cost of Sales. The UA account, which had begun the fiscal year with a balance of $88,432, had a balance of $827,922 on June 24, 1966, an increase of $739,490, based upon cumulative monthly loss estimates throughout the fiscal year. The balance in the account as of June 24, 1966, was reversed as described *20 above, and credited to Cost of Sales before yearend. A new UA account balance was established as of the end of the fiscal year ended July 29, 1966, in the amount of $111,662.68, again based upon estimated inventory loss between the June physical inventory date and the end of the fiscal year. When the physical inventory was taken on January 13, 1967, midway through the following fiscal year, an overage of $191,054 was determined. The fiscal 1967 yearend physical inventory, which was taken on June 2, 1967, disclosed another overage of $66,421, for a total overage of $257,475. Yet, as of the June 2, 1967, inventory date, the UA account had an accumulated balance of $497,959, which again was reversed to Cost of Sales by yearend. A new UA reserve balance was established as of the end of the fiscal year, July 28, 1967, in the amount of $94,522, based upon estimated losses for the period between the physical inventory date and the fiscal yearend. Allied continued to accrue additions to the account during the following fiscal period through the date of sale to Delaware (October 27, 1967), at which time the balance was $173,419. C. Devaluation Reserve
Under a set of written procedures, *21 Allied's merchandising staff (consisting of buyers, rebuyers, and merchandise managers) during the taxable years at issue classified approximately 15 to 20 percent of its inventory items as items to be devalued. The purpose of the devaluation procedure was to reduce those items of inventory to reflect the lower estimated value which could be realized from their sale. The aggregate of these devaluations was reflected in Allied's Devaluation account, which account was carried as a reserve or contra-account, reducing the basic inventory account. Allied had two or three merchandise managers. Reporting to the merchandise managers were the buyers, of which there were between 18 and 24. Reporting in turn to the buyers were rebuyers.The buyers developed recommendations of what items should be purchased and the prices at which they should be sold in the catalogues, sales fliers, and retail stores, subject to review and approval by their superiors, the merchandise managers. Each buyer was assigned responsibility for a limited number of inventory items. The rebuyers' functions were to reorder merchandise. Most of these personnel had had years of experience in electronics, either at Allied *22 or at other companies. The buyers and rebuyers took an active part in the taking and compilation of the inventory, and were responsible for the assignment of the Devaluation classification, if any, for each item of inventory. Items that were devalued were assigned under the written procedures to one of four Devaluation classifications--Classes 1, 1A, 3A, or 3B. Class 1 merchandise was so classified pursuant to a complex formula which, in general, included merchandise in excess of the estimated demand for approximately 6 months, with certain exceptions. Class 1A merchandise was inventory listed in Allied's current sales catalogue, which to the extent such merchandise was in excess of anticipated demand, was not to be listed in the subsequent sale book, and was not to be relisted in any further catalogue. Class 3A merchandise was inventory which was not listed in the then current annual catalogue and which was not to be relisted. Class 3B merchandise was merchandise which had been previously classified as Class 3A merchandise. Class 1 and Class 1A merchandise was devalued by 25 percent of the book value (then current standard cost) for consumer merchandise and by 30 percent *23 of such book value for industrial merchandise. In the case of both Class 1 and Class 1A items, Allied reduced its offering prices, but an effort was made in the stores and sales fliers to recover Allied's cost. Class 3A merchandise was devalued by 20, 40, 60, or 100 percent and Class 3B merchandise was devalued by 60 or 100 percent of the then reduced book value of such merchandise. The percentage to be used was selected by the buyers or rebuyers who were responsible for purchase of the particular items, with review by the merchandise managers and the marketing vice-president and controller if the devaluation was large in amount. A 20- or 40-percent devaluation was used on Class 3A and 3B items in cases where the item was returnable to the vendor; in those cases, the cost of return was borne by Allied and the vendor exacted a restocking charge. The resulting charge, plus cost of return, normally amounted to a percentage of the book value of the inventory, with the percentage varying somewhat. Knight was a wholly owned subsidiary of Allied until April 7, 1967, when it was liquidated and all of its assets, subject to all of its liabilities, were transferred to Allied. Knight *24 was engaged in the development and sale of amateur radio kits. After Knight's liquidation, its business was operated as the Knight Division of Allied. Knight had maintained its inventory on the basis of first-in, first-out (FIFO) and the lower of cost or market. Knight had established an account entitled "Reserve for Overstock to Reflect Excess Inventory," which was applied as a reduction of, or contra-account to, inventory. After the liquidation of Knight, Allied established on its books and reflected in its tax returns the account known as "Overstock-- Knight Division" for its taxable year ended July 28, 1967, and its taxable period ended December 31, 1967. The Knight Division inventory consisted of the parts that were assembled into approximately 84 varieties of electronic kits, with each kit containing 400 to 500 parts. The book value of Knight kit parts in excess of (a) production requirements for 1 year plus (b) the quantity needed for repair parts for 5 years, was eliminated from inventory by means of the "Overstock--Knight Division" account. As was the practice in the use of Allied's Devaluation account, the "Overstock--Knight Division" account was utilized to reflect *25 the reduced value which would be realized from the sale of Knight's excess inventory of electronic kits. 4. Legal Fees
Until June 15, 1967, Allied leased property, upon which its main plant and adjoining parking facilities were located, from a land trust in which a director and a daughter of another director of Allied had beneficial interest. On June 15, 1967, the property subject to such leases, together with certain real estate owned by Allied in the adjoining area, was sold to an entity beneficially owned by Edward Ross. As part of this transaction, Allied leased back the entire property for a term of 25 years. Edward Ross was not affiliated with Allied but was executive vice-president of another corporation of which a director of Allied was president and chairman. In connection with this transaction Allied paid legal fees totaling $29,959.25. These fees were deducted in Allied's Federal income tax return for the year ended July 28, 1967. Also deducted in such return was a legal fee in the amount of $583.17 paid in connection with the registration of a securities issue. Respondent determined that all of the foregoing legal fees constituted nondeductible capital *26 expenditures. 5. Depreciation Recapture
In computing gain under sections 1245 and 1250 from the disposition of depreciable property on its Federal income tax return for the taxable period ended December 31, 1967, Allied aggregated all items of such property, and reported as taxable gain the aggregate net gain from the disposition of all such items, in the amount of $131,053. Such computation was made by Allied as follows: Furniture and fixtures: Fair market value [1]/
$1,396,796
Net book value cost
$1,187,695
Less: Reserve for depreciation
609,037
578,658
818,138
Leasehold improvements: Fair market value [1]/
111,041
Net book value cost
1,288,960
Less: Reserve for depreciation
490,834
798,126
(687,085)
Aggregate net amount of recapture
gain as reported by Allied
$ 131,053
Included in the reported fair market value of furniture and fixtures were cafeteria equipment at a value of $103,536 and a conveyor system at a value of $80,973. The cafeteria equipment had been classified as a part of the *27 leasehold improvements account on Allied's books. Respondent recomputed Allied's recapture gain and determined that the amount reported in its return, $131,053, had been understated by $564,256. This substantial increase resulted principally from respondent's refusal to allow any loss in connection with disposition of the leasehold improvements to be netted against the gains on the disposition of other assets. 6. Net Operating Loss Deduction
Under section 381(a)(1) and (c)(1), Allied succeeded to and was entitled to take into account the net operating loss carryovers of Knight upon its liquidation on April 7, 1967. Such carryovers at the date of liquidation amounted to $632,432. Allied, in its tax return filed for the taxable year ended July 28, 1967, claimed a net operating loss deduction of $424,089, with the result that the remaining carryover of Knight to the following taxable period, ended December 31, 1967, amounted to $208,343.Allied claimed a net operating loss deduction in the amount of $194,938 in its tax return for such taxable period. Based on his other adjustments to Allied's taxable income, respondent allowed an additional net operating loss deduction *28 of $71,727.84 for the taxable year ended July 28, 1967, and disallowed the net operating loss deduction claimed for the taxable period ended December 31, 1967, to the extent of $58,323.39. ULTIMATE FINDINGS OF FACT 1. Of the total consideration received by Allied for the sale of its assets to Delaware, $623,700 was attributable to the Knight drawings, tooling, and artwork. No portion of such consideration was paid for unconsumed supplies. 2. The reduction by Allied of its closing inventory for each of the taxable periods in issue by the then balances in the PDV reserve, the UA reserve, the Devaluation reserve, and the Overstock-Knight Division reserve, did not clearly reflect income of Allied for such respective taxable periods. 3. The Devaluation reserve computed by Allied for the taxable year ended July 30, 1965, included $51,492, by which amount respondent had separately increased Allied's taxable income for such year. 4. The cost of a conveyor system disposed of by Allied in its taxable period ended December 31, 1967, had been included as part of leasehold improvements on Allied's books. 5. The amount of assumed fair market value utilized by Allied in its *29 computation of gain from the disposition of furniture and fixtures in its taxable period ended December 31, 1967, included as furniture and fixtures certain test equipment which had been reflected as inventory on Allied's books at a cost of $280,496. OPINION 1. Section 337 Liquidation
A.Tax benefit recovery
On or about October 20, 1967, Allied, pursuant to its plan of liquidation under section 337, transferred all of its assets, subject to all of its liabilities, to Delaware, then a subsidiary of petitioner, in exchange for stock and cash. Respondent argues that Allied's assets so transferred included items of previously expensed, unconsumed supplies valued at $60,000, and drawings, tooling, and artwork developed by Knight, valued at $623,700, the cost of which had been previously deducted by Knight. Relying on the tax benefit rule, respondent argues that the total of these amounts, $683,700, should be included in Allied's income for its taxable period within which the liquidation-sale occurred. Petitioner contends that Allied received nothing for these assets from Delaware. In respect of Allied's unconsumed supplies, petitioner maintains that their existence *30 was never mentioned in the sale negotiations and, therefore, none of the consideration received by Allied was paid for those supplies. Petitioner also contends that the Knight drawings, tooling, and artwork had no value since previous attempts to sell them had been unsuccessful and that, therefore, Allied could not have received any thing of value for these items upon the sale of its assets to Delaware. Alternatively, petitioner contends that even if Allied received any value for the unconsumed supplies or for the Knight assets, section 337 precludes the recognition of any gain therefrom. The applicability of the so-called tax benefit rule to sales of assets pursuant to a section 337 liquidation has been the subject of much litigation. E.g., Anders v. United States,462 F.2d 1147, 1148-1149 (Ct. Cl. 1972), cert. denied 409 U.S. 1064 (1972); Connery v. United States,460 F.2d 1130, 1133 (3d Cir. 1972); Spitalny v. United States,430 F.2d 195, 197-198 (9th Cir. 1970); Commissioner v. Anders,414 F.2d 1283 (10th Cir. 1969), revg. 48 T.C. 815 (1967), cert. denied 396 U.S. 958 (1969); *31 Estate of Munter v. Commissioner,63 T.C. 663 (1975); Stewart Trust v. Commissioner,63 T.C. 682 (1975). While section 337 generally allows nonrecognition of gain upon the sale of the assets of a liquidating corporation, these cases establish that amounts received by the corporation for previously expensed but unconsumed assets do not fall within the nonrecognition provisions of section 337. Normally, in the case of a continuing corporation, the advantage gained by the full expensing of such items in one year is offset by the lack of any deduction therefor in the year in which such items are actually consumed. This balance, based on the fictional use of the items in the earlier year, is destroyed in the case of a section 337 liquidation. To ameliorate this consequence of the annual accounting principle and to achieve what has been perceived to be the cogressional purpose, the courts have treated the section 337 liquidation as causing a fictional conversion of the expensed items into property which requires their value, under the principle of the tax benefit rule, to be treated as ordinary income in the year of the liquidation. See, e.g., analysis *32 in Anders v. United States,462 F.2d at 1149. In the instant case, the record establishes, with regard to the Knight drawings, tooling, and artwork, that the cost of these assets had been deducted in full some time prior to the years in issue. Notwithstanding petitioner's argument to the contrary, these assets had a recognizable market value of at least $623,700. Such value is shown by the appraisal report issued by M & S, an independent appraisal company. Indeed, Delaware, upon completion of its purchase of Allied's assets, placed these Knight assets on its own books at their appraisal value of $623,700, and subsequently claimed depreciation based upon such amount as these assets' cost basis. Petitioner's reliance upon Allied's failure in its efforts to dispose of these assets prior to the sale to Delaware as indicative that they had no value is not persuasive. We must conclude that the Knight assets in question were an integral part of the assets for which Allied received consideration, and we have found as an ultimate fact that Delaware paid Allied $623,700 of the total consideration for those assets. The previously expensed Knight assets sold by Allied *33 must be treated as having been "reconverted" into property upon their sale to Delaware. Accordingly, Allied may not rely on the nonrecognition provisions of section 337 and must include as ordinary income the amount realized with respect to these assets--$623,700. Anders v. United States,supra; Estate of Munter v. Commissioner,supra.
We do not, however, agree with respondent's contention that Allied must also include as ordinary income $60,000, representing the value of allegedly unconsumed supplies transferred to Delaware as part of the sale transaction. While the record indicates that there were some unconsumed supplies included in Allied's assets, nothing in the record indicates that these items were of sufficient value to petitioner to have been included as part of the total consideration paid to Allied. The M & S appraisal report, which is quite exhaustive and detailed, makes no mention of such supplies, and nothing in the record indicates that Delaware received or placed any value on them. The critical element in the cases cited above is that the selling corporation must realize a "recovery" with respect to previously expensed *34 assets, which causes a "reconversion" into property and results in realized gain. Anders v. United States,462 F.2d at 1149; Estate of Munter v. Commissioner,supra at 676. A necessary corollary to such reconversion theory is that the expensed assets have some value which could be recovered and which would support the conclusion that the purchasing corporation in fact paid for them. From the record, we must conclude that whatever supplies Allied possessed were of such a nominal value as to not be considered in the purchase price of Allied's assets. Accordingly, Allied did not realize taxable income with respect to any unconsumed supplies which may have been included in the assets transferred to Delaware. [4]A/ B. Liquidation expenses
Allied incurred $385,064.92 in expenses resulting from the sale of its assets to Delaware and its subsequent liquidation. For its taxable period ended December 31, 1967, Allied deducted in full these expenses, and such deduction was disallowed by respondent. *35 In support of Allied's deduction, petitioner relies on United States v. Mountain States Mixed Feed Co.,365 F.2d 244 (10th Cir. 1966), and Pridemark, Inc. v. Commissioner,345 F.2d 35 (4th Cir. 1965), revg. on this issue 42 T.C. 510 (1964). Both of these cases allow the deduction of expenses in connection with a section 337 sale and liquidation on the theory that such expenses are ordinary and necessary expenses of doing business. A contrary result has been reached in later decisions of several other circuit courts, including Connery v. United States,460 F.2d 1130, 1134 (3d Cir. 1972); Lanrao,Inc. v. United States,422 F.2d 481, 484-485 (6th Cir. 1970), cert. denied 398 U.S. 928 (1970); United States v. Morton,387 F.2d 441, 450 (8th Cir. 1968); and Alphaco, Inc. v. Nelson,385 F.2d 244, 245 (7th Cir. 1967). Moreover, the fourth circuit's position in the Pridemark case, relied upon by petitioner, was reversed by that circuit in Of Course, Inc. v. Commissioner,499 F.2d 754, 756, 759 (4th Cir. 1974), revg. 59 T.C. 146 (1972). *36 These cases, all decided after the ones relied on by petitioner, adopt the theory that expenses which relate to a section 337 sale of assets in what is essentially a capital transaction should be treated in the same manner as any other sale of a capital asset, i.e., added to the basis or deducted from the selling price in determining gain or loss; the nonrecognition provisions of section 337 do not change the fundamental treatment of these selling expenses. See, e.g., Lanrao, Inc. v. United States,supra at 485. [5]/ These cases represent the position of the third, fourth, sixth, seventh, and eighth circuits on this issue. The position adopted by those circuits has also been the consistent position of this Court. Pridemark, Inc. v. Commissioner, 42 T.C. at 541; Of Course, Inc. v. Commissioner, 59 T.C. at 151-152; Stewart Trust v. Commissioner,63 T.C. at 694-695. [6] Only the tenth circuit (in United States v. Mountain States Mixed Feed Co.,supra) stands to the contrary. *37 The weight of authority supports respondent's position. We adhere to such authority and deny petitioner's broad position. Petitioner, however, contends that the foregoing authority is not entirely dispositive of the issue in the factual circumstances of the instant case. Petitioner points out that all the expenses in question did not relate to the sale of Allied's assets. Some of them pertained to the subsequent corporate liquidation proceedings, and that to the extent that they related to the latter, they are deductible. It further contends that the theoretical basis for the holdings in the cases relied upon by respondent is inapplicable to the extent that a section 337 sale of assets generates recognizable income through recapture of depreciation, recovery of bad debt reserves, tax benefit recoveries, and other similar exceptions to the general nonrecognition principle of section 337. Several courts have held that expenses incurred by a corporation in connection with a complete liquidation [7]/ are deductible as ordinary and necessary expenses of doing business. Gravois Planing Mill Co. v. Commissioner,299 F.2d 199, 206 (8th Cir. 1962), revg. a Memorandum *38 Opinion of this Court; Commissioner v. Wayne Coal Mining Co.,209 F.2d 152 (3d Cir. 1954), affg. per curiam a Memorandum Opinion of this Court; United States v. Arcade Co.,203 F.2d 230, 236 (6th Cir. 1953), cert. denied 346 U.S. 828 (1953). Moreover, in United States v. Mountain States Mixed Feed Co.,supra, and Lanrao, Inc. v. United States,supra, even though the Commissioner contested the deduction of expenses relating to the section 337 sale of assets, he allowed the deduction of a small portion of the total expenses incurred, as attributable to the actual corporate liquidation. In the instant case, however, respondent has not allowed any portion of the expenses in question. The stipulation of facts contains an itemized list of nine payees and the amounts paid by Allied to each, totaling $385,064.92, "in connection with the sale of its assets * * *, its liquidation, and otherwise." Petitioner *39 now contends on brief that one-third of this total would represent a "reasonable allocation" to deductible liquidation expenses, with two-thirds allocable to section 337 sale expense. However, petitioner has introduced no evidence to establish a proper allocation of the total stipulated expenses. While we realize that this is one of the lesser issues in this case and that petitioner has relied on its primary position that even the selling expenses are deductible (under United States v. Mountain States Mixed Feed Co.,supra), nonetheless, petitioner does bear the burden of proof in establishing what, if any, portion of the total stipulated expenses are deductible as related to the liquidation. Most of the stipulated payees appear to be professional organizations of various types, but it would be pure speculation on our part to attempt to allocate the sums paid between selling expenses and corporate liquidation expenses. Petitioner has made no attempt to even identify the nature of the services performed by all of the payees listed, let alone to establish the relevant allocation of any of such services. In such circumstances we have no basis for adopting petitioners' *40 proposed "reasonable allocation" of one-third of the total stipulated expenses to deductible liquidation expense. Accepting the premise that, on the trial record, the entire sum in question is to be treated as expenses of the section 337 sale, we now consider petitioner's argument that the portion of such expenses allocable to the sale of the assets giving rise to reportable income should be deductible against such income.While this particular issue does not appear to have been considered in any of the prior cases, we think petitioner's position has merit. We have held that the costs of the section 337 sale are to be treated as a reduction of the gain on the sale. However, in this case Allied's gain was in part nontaxable under the general rule of section 337 and in part taxable by reason of depreciation and investment credit recapture, recovery of its bad debt reserve, and, as held above, the tax-benefit recovery of the cost of the previously deducted Knight Division drawings, tooling, and artwork. To the extent that the selling expenses are allocable to the recognized portion of the total gain, such portion of the selling expenses would partially offset such recognized gain, *41 and therefore be effectively currently deductible. To hold otherwise would be an arbitrary misallocation of the entire amount of the expenses solely to the nonrecognized portion of an integrated gain consisting of both recognized and nonrecognized portions. [8]/ *42 Since it is unlikely that the expenses in question could be specifically identified with either the assets giving rise to recognized income or to those which do not, an appropriate method of allocation would be to simply treat these expenses as a reduction of the total amount realized by Allied in the liquidation sale (consistent with the rationale of the cases which disallow the deduction of such expenses as business expenses). The reduced net amount realized would then be reallocated among all of the assets sold (including those which generate recognized income) in the same ratio as the original allocation of the gross income realized. Stated another way, the total amount of the expenses in question should be allocated in reduction of the gain on each of the respective assets sold in the same ratio as the amount realized upon the sale was allocated. The computation may be made in connection with the computation under Rule 155. 2.Inventory Adjustments
Allied's closing inventories, computed on the basis of standard costs, were reduced by various "reserves," including the PDV reserve, the UA reserve, the Devaluation reserve, and the Overstock--Knight Division reserve. Respondent *43 has challenged all of these reductions in closing inventory as causing distortions of income for the respective taxable periods involved. Such reductions in closing inventory resulted in increases in cost of goods sold, thereby reducing taxable net income for the respective periods. [9]/ Respondent has recomputed Allied's net income, based upon closing standard cost inventories without the foregoing reductions. The Commissioner has far-reaching authority, under several sections of the Internal Revenue Code, to make such a recomputation. *44 The most general of these is section 446(b), which provides: If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. The Commissioner possesses "broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." Commissioner v. Hansen,360 U.S. 446, 467 (1959), revg. 258 F.2d 585 (9th Cir. 1958), affg. in part, revg. in part, and remg. a Memorandum Opinion of this Court.In section 471 further authority has been granted the Government to prevent manipulation of reportable net income specifically through inventory accounting practices: SEC. 471.GENERAL RULE FOR INVENTORIES. Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade *45 or business and as most clearly reflecting the income. Additionally, section 446(e) effectively enables respondent to prevent income distortions which might result through changes in accounting methods: (e) Requirement Respecting Change of Accounting Method.--Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate. Sec. 1.446-1(e)(2)(ii)(c), Income Tax Regs., further provides that: "A change in an overall plan or system of identifying or valuing items in inventory is a change in method of accounting [for purposes of section 446(e)]." Under both sections 446(b) and 471, the objective in the exercise of the Commissioner's authority is "to clearly reflect income." It is now well established that an accounting method which may be perfectly acceptable--or even the best accounting practice--for the financial reporting needs of a business may not clearly reflect income for tax purposes. American Automobile Assn. v. United States,367 U.S. 687, 693 (1961). *46 Whether a given method of accounting clearly reflects income is a question of fact. Artnell Co. v. Commissioner,400 F.2d 981, 983-985 (7th Cir. 1968), revg. and remg. 48 T.C. 411 (1967). Should the Commissioner determine, as he has here, that inventory procedures are improper, it is incumbent upon the taxpayer to carry the heavy burden of proving that such determination is arbitrary and a clear abuse of statutory discretion. Lucas v. Structural Steel Co.,281 U.S. 264, 271 (1930); Brooks-Massey Dodge, Inc. v. Commissioner,60 T.C. 884, 894 (1973); All- Steel Equipment, Inc. v. Commissioner,54 T.C. 1749, 1761 (1970), affd. on this point 467 F.2d 1184 (7th Cir. 1972); Photo-Sonics, Inc. v. Commissioner,42 T.C. 926, 931 (1964), affd. 357 F.2d 656 (9th Cir. 1966). In the light of these overriding general principles, we proceed to examine each of the specific inventory adjustment practices in question. A. Price Differences or Variances (PDV) Reserve
For annual reporting purposes, Allied conducted a physical inventory count between 4 and 8 weeks prior *47 to the close of each fiscal year. In instances where the new standard cost of an item was higher than the old standard an adjustment would be made increasing the "old standard" closing inventory by the amount of the difference (referred to as "plus price variance"). However, instead of reducing the "cost of goods sold" by the amount of this plus price variance (which would be the normal consequence of higher yearend inventory valuation), Allied carried such amount as the PDV reserve, an offset to its closing inventory, on its books as of the close of the fiscal period. The net result was simply that the closing inventory was effectively valued at the old standard cost, both in the balance sheet and in the computation of cost of goods sold. [10]/ The PDV reserve was subsequently amortized as part of cost of goods sold during the first four 4-week periods of the following fiscal year. Petitioner stoutly defends Allied's standard cost inventory practices as applied during the years in question. The evidence of record, including the testimony of witnesses *48 expert in such accounting matters, shows that Allied's inventory method represented sound business accounting practice. The fault which respondent finds in this method, however, is that it creates an impermissible year-to-year deferral of taxable income. Specifically, respondent contends that, by reducing its closing inventory by the PDV account, Allied in effect reflected the entire amount of such inventory as if it had been purchased at the lower "old standard" costs, when in fact, a substantial portion of such closing inventory consisted of items purchased at the more recent higher "new standard" costs. Thus, by effectively understating the closing inventory, Allied has overstated its cost of goods sold, thereby reducing taxable net income. In defense of Allied's method, petitioner argues that any such understatement of inventory by reason of the offsetting of the PDV account was eventually eliminated through the subsequent amortization of the PDV account. While it is true that the PDV account was subsequently amortized by charges to cost of goods sold, such amortization did not take place until the early portion of the subsequent taxable year. Such amortization, of *49 course, did have the effect of correcting the understatement of the opening inventory for the subsequent year, but it did not alter or offset the effective understatement of income in the year that the reserve was created. An inventory accounting question closely analogous to the instant case was dealt with in F. C. Henderson Co. v. Commissioner,5 B.T.A. 570 (1926). In that case the taxpayer was a dealer in "talking machine" records. It recorded purchases of records at cost, but when the replacement value of records in its inventory increased, due to manufacturers' price increases, it wrote up its inventory by the amount of the increase, with a corresponding credit to a "reserve for appreciation." In computing its cost of goods sold for the period in question, the taxpayer reduced its yearend inventory by the amount of this reserve. The Commissioner disallowed this reduction. The Board of Tax Appeals held that the propriety of the taxpayer's adjustment to yearend inventory depended upon the extent to which such inventory actually included records which had been originally purchased at the lower costs in effect prior to the upward valuation adjustments. With *50 respect to such records the offset of the applicable reserve amount would be necessary to effectively reduce the upward-adjusted yearend value back down to the actual lower cost. However, the Board held in favor of the Commissioner because the taxpayer had not established what portion, if any, of the yearend inventory actually consisted of records purchased at the lower cost.
The rather simple rationale of Henderson is equally applicable here. To the extent that the actual ending inventory consists of items purchased at the old standard cost, reduction of the closing inventory (valued at the higher new standard cost) would be proper; to the extent that it consists of items actually purchased at the higher new standard cost, the reduction would represent a distortion. Of course, under the standard cost inventory method the actual cost of each item in the closing inventory is not ascertainable. While the ending inventory determined under a standard cost method involves a fundamentally acceptable system of estimation, when the Commissioner determines that the inventory amount so determined does not clearly reflect income, it is incumbent upon the taxpayer to demonstrate that *51 his estimates at least closely approximate actual costs. In the instant case, petitioner has not attempted to establish what portion, if any, of the closing inventory of each of the periods in question represented items actually purchased at the lower old standard cost. While petitioner could not reasonably be expected to be able, at this point in time, to establish precisely the actual costs of specific items constituting Allied's yearend inventories in the mid-1960's, it does seem incumbent upon petitioner, if it is to prevail under the Henderson rationale, at least to establish in a general way the extent to which closing inventories for the years in question consisted of old merchandise purchased at old standard costs. In the absence of such a direct showing, it is reasonable to conclude in the light of the other evidence of record that a substantial portion of such closing inventories was acquired at the more recent new standard costs. Allied's inventory turned over every 16 weeks on the average. The physical inventory was taken within 4 to 8 weeks before the end of the fiscal year. New standard costs were based upon estimated replacement costs at the time of the *52 inventory taking and thereafter. Thus, purchases of goods during the last 4 to 8 weeks of the fiscal year, evidently at the new standard costs, constituted a major cost element of the actual closing inventory. In light of the foregoing, we are unable to conclude that petitioner has carried its burden of proving that respondent's disallowance of the PDV reserve in computing Allied's ending inventories was an abuse of his statutory discretion under sections 446(b) and 471 to clearly reflect income. F. C. Henderson Co. v. Commissioner,supra.
B. Unidentified Attrition (UA) Reserve
Again relying on the discretionary power granted him by section 471, respondent has determined that Allied's use of its reserve account for unidentified attribution (UA) resulted in an understatement and distortion of taxable income for the taxable periods in issue. Respondent also contends that Allied's adoption of the UA account beginning with its 1965 fiscal year constituted an unconsented change in its accounting method. Petitioner's justification for Allied's use of the UA account is premised on two factual assumptions: First, Allied's inventory was subject to continuing *53 periodic losses due to theft, clerical errors, breakage, and other causes, and, second, that estimates of such unidentified attrition could reasonably and properly be made for a given period in relation to the sales volume for such period. As to the first premise, the evidence is abundantly clear that Allied did suffer inventory losses due to unidentified causes. Indeed, the existence of such losses was determined each year when Allied completed the taking of its physical inventories. However, respondent has challenged the method by which Allied estimated its unidentified attrition losses for the 4-to 8-week period between the completion of the taking of physical inventories and the close of each fiscal year in issue. These estimates, based upon a percentage of Allied's sales volume, comprised the yearend balance in the UA account which was used to reduce Allied's closing inventories. Respondent contends that Allied's estimates were based on vague, unreliable assumptions, and that the reserve balances based on those untenable assumptions caused a distortion in closing inventory and taxable income. Petitioner has done little to establish the reasonableness and propriety of the *54 UA reserves in question. Although it has been stipulated that the reserve amount was computed as a percentage of sales for the period between the inventory date and the close of the fiscal year, petitioner did not attempt to demonstrate what percentage was used or how such rate was determined. More significantly, petitioner has failed to explain the relationship between inventory losses and sales. Contrary to Allied's apparent assumptions, it would seem that in a period of high sales, the inventory on hand would be lower than in a period of slow or normal sales, and that the rate of inventory attrition would be lower when less inventory is on hand. Yet, under Allied's estimation formula, the UA reserves would be higher in periods of higher sales. While there may be some reason that the foregoing logic is inapplicable to Allied's situation, such reason is not apparent from the record. Our Findings of Fact set forth the actual inventory attrition losses, determined after semiannual physical inventory counts, for each 6-month period during the years at issue herein, as stipulated by the parties. If such actual inventory loss figures are allocated ratably to each 4-week segment *55 within each respective 6-month period, it can be seen that the estimates utilized for the UA reserve for the 4- to 8-week period in question herein (i.e., the period between the physical inventory count and fiscal yearend) bore no consistent relationship to the actual inventory losses (ratably allocated) for either the 4- to 8-week period immediately preceding or the 4- to 8-week period immediately following the respective 4- to 8-week period in question. Petitioner refers us to two cases as supportive of Allied's UA reserve practices: Swinehart Tire & RubberCo. v. Commissioner,2 B.T.A. 223 (1925) and Rhinelander Paper Co. v. Wilkinson, an unreported case ( E.D. Wis. 1935, 16 AFTR 1041, 35-1 USTC par. 9328). However, these authorities are not apposite. In both cases the inventory shrinkage had been determined by the actual physical inventory count, and the question presented related to the proper year to which to allocate the shrinkage losses so determined. Neither case dealt with the practice of estimating such losses, which is the issue herein. Accordingly, we are compelled to hold that Allied's reduction of its closing inventory *56 by the UA reserve for each of the periods in question did not clearly reflect income, and respondent acted properly in utilizing his statutory discretion under sections 446(b) and 471 in so determining.
C.Devaluation Reserve
In its attempt to justify Allied's inventory devaluation procedures, petitioner relies primarily on section 1.471-2(c), [11]/ Income Tax Regs., which provides guidelines by which subnormal inventory items may be carried at reduced values. Petitioner argues that several of Allied's inventory categories, namely Classes 1, 1A, 3A, and 3B, fall within the meaning of "any goods in an inventory which are unsalable at normal prices or unusuable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes." Petitioner also contends that Allied adequately verified the extent of its inventory devaluation by the various attempts to sell the devalued items subsequent to their reduction in value. We disagree with petitioner's view of the scope of section 1.471-2(c), Income Tax Regs.
*57 The periodic reduction of inventory value is an integral part of the lower of cost or market method of valuation. Such method in turn is a limited exception to annual accounting principles which otherwise preclude recognition of unrealized losses. Thor Power Tool Co. v. Commissioner,563 F.2d 861 (7th Cir. 1977), affg. 64 T.C. 154 (1975). The procedure by which inventory accounts may be devalued in accordance with fluctuating market conditions are specifically detailed by the regulations, and adherence to those prescribed methods is mandatory. Thor Power Tool Co. v. Commissioner, 64 T.C. at 169. Under section 1.471-2(c), Income Tax Regs., it is clear that petitioner must establish first that the inventory items subject to devaluation come within the meaning of subnormal goods, as being unsalable at normal prices due to damage, obsolescence, or similar causes. Second, the reduction in value must be substantiated by establishing the "bona fide selling price" of the devalued inventory by showing actual offering prices for the goods within 30 days of inventory date. The last sentence of section 1.471-2(c), Income Tax Regs., imposes *58 upon petitioner the burden of both showing the subnormal nature of the devalued inventory and maintaining records verifying its disposition. In support of its position that Allied's devalued inventory falls within the meaning of "subnormal" goods, petitioner introduced documents outlining Allied's devaluation procedure. In analyzing Allied's procedure, it becomes quite clear that Allied's basic criteria for devaluation was simply a comparison of its current inventory against projected market demand. To the extent inventory exceeded projected marked demand as determined by Allied's marketing division, it was designated as Class 1, 1A, 3A, or 3B, and devalued according to established percentages. While it is true that for financial reporting purposes excess inventory might be of less value to the retailer, it is clear that mere excess inventory does not fall within the classification of subnormal goods for purposes of section 1.471-2(c), Income Tax Regs.Thor Power Tool Co. v. Commissioner,supra; see Cleveland Automobile Co. v. United States,70 F.2d 365, 369 (6th Cir. 1934), cert. denied 293 U.S. 563 (1934); D. Loveman & Son Export Corp. *59 v' Commissioner,34 T.C. 776, 799 (1960), affd. 296 F.2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962). While a possible inference might be drawn concerning Class 1A, 3A, and 3B inventory as being obsolete because of its projected or current delisting from Allied's sales catalogues, petitioner has failed to distinguish obsolete or damaged items of inventory from excess items. Indeed, in its own procedures, Allied listed all devalued classes of inventory as "overstock," and no further breakdown in those procedures provided any indication that the "overstock" merchandise was in any way damaged or obsolete or otherwise distinguishable from inventory carried at normal prices. Petitioner has, therefore, failed to prove what portion, if any, of the inventory in question falls within the specific language of the regulation. E. W. Bliss Co. v. United States,224 F. Supp. 374, 378, n. 1 (N.D. Ohio 1963), affd. 351 F.2d 449 (6th Cir. 1965). We must, therefore, conclude that Allied's devaluation procedures did not meet the regulatory requirements of section 1.471-2(c), Income Tax Regs.
The instant factual *60 situation is virtually indistinguishable from that which was litigated in the recent case of Thor Power Tool Co. v. Commissioner,supra. In that case the taxpayer had taken various inventory writedowns for obsolescence and other reasons. To the extent that the writedowns were supported by actual dispositions of the goods in question, they were not challenged by the Commissioner.However, the Commissioner did disallow certain other writedowns which had been based upon no more than management's estimate of the extent to which the inventory was in excess of anticipated demand. The Court held that respondent did not abuse his statutory discretion under section 471 by disallowing these latter writedowns and that holding was recently sustained on appeal. Despite petitioner's arguments to the contrary, we find no material difference between the inventory writedowns which were disallowed in Thor Power Tool Co. and the Devaluation reserves disallowed by respondent in this case. Accordingly, we must sustain respondent on this issue. For the same reasons, we must also sustain respondent's disallowance of Allied's Overstock--Knight Division reserve. From the record, it is clear *61 that the methods employed in arriving at the Knight overstock devaluations were essentially the same as those employed in determining Allied's Devaluation reserve. The inventory devalued was that which was determined to be in excess of Knight's projected market needs and was, therefore, not within the definition of subnormal goods as required by section 1.471-2(c), Income Tax Regs. Accordingly, respondent's disallowance of the Overstock--Knight Division reserve is sustained. Thor Power Tool Co. v. Commissioner,supra.
With respect to respondent's disallowance of Allied's Devaluation reserve for the taxable year ended July 30, 1965, petitioner contends that there has been a duplication of adjustments to the extent of $51,492. Specifically, petitioner asserts that respondent had made a separate adjustment increasing Allied's fiscal 1965 taxable income with respect to "shrinkage" in the amount of $51,492 and, further, that such amount had not been separately deducted by Allied, but was included as part of the claimed Devaluation reserve which was disallowed by respondent. On this ground, petitioner requests that the adjustment to Allied's fiscal 1965 income taxes with respect *62 to the Devaluation reserve be reduced by $51,492. We agree with petitioner. The audit report of respondent's agents for Allied's 1965 fiscal year shows a $51,492 adjustment in Allied's inventory "shrinkage" account. Petitioner has supplied additional evidence consisting of accounting working papers and oral testimony which adequately establishes that the $51,492 adjustment for so-called "shrinkage" was actually a part of the Devaluation reserve, and, accordingly, we sustain petitioner's proposed adjustment in this respect. Petitioner on brief has also asserted that $104,541.12 of the Overstock--Knight Division balance as of fiscal yearend July 28, 1967, was attributable to deductions taken by Knight, before its liquidation into Allied, and that to include such amount in Allied's income "is both inequitable and unauthorized by section 481." Petitioner also claims that Allied was denied the benefit of section 481(b) adjustments in respondent's computations with respect to the Devaluation and Overstock--Knight Division adjustments. However, petitioner has presented no further explanation of such assertions and we conclude they are without merit. Because of our resolution of *63 the foregoing inventory valuation issues in favor of respondent, based upon his statutory discretion, under sections 446(b) and 471, to clearly reflect income, we need not reach the issue of whether any of Allied's inventory practices in question constituted a change of accounting method without the consent of the Commissioner under section 446(e). See Thor Power Tool Co. v. Commissioner, 64 T.C. at 174. 3. Legal Fees
In its return for its taxable year ended July 28, 1967, Allied deducted certain legal fees, totaling $30,542.42, which respondent has disallowed. The major portion of this amount, $29,959.25, was paid in connection with a sale and leaseback transaction in which Allied obtained a 25-year lease on its main plant and adjoining property. Petitioner claims that the fees were not spent to acquire a capital interest in the property, but were instead expended in connection with significant legal questions concerning the involvement of corporate "insiders" as possible interested parties in the transaction. Thus, petitioner contends, these expenses should be deductible in full. We disagree. In determining the proper tax treatment of legal expenses, *64 it is necessary to examine the origin of the expenses, and not, as petitioner contends, the "purpose" of those expenses. Woodward v. Commissioner,397 U.S. 572, 577 (1970); P. Liedtka Trucking, Inc. v. Commissioner,63 T.C. 547, 555 (1975). See also United States v. Gilmore,372 U.S. 39 (1963). If the origin of the expenses was the acquisition of a capital asset, the legal fees must be capitalized. P. Liedtka Trucking, Inc. v. Commissioner,supra.
In the instant case the fees in question related to a transaction in which Allied acquired a 25-year leasehold interest in a building, clearly a capital asset. Ray v. Commissioner, 18 T.C. 438, 441 (1952), affd. 210 F.2d 390 (5th Cir. 1954), cert. denied 348 U.S. 829 (1954). While petitioner presented testimony of a former Allied officer that Allied's management was concerned with the possibility of legal complications resulting from "insider" involvement in the sale-leaseback, it is nonetheless clear that the legal fees expended in this connection were an integral part of the transaction and would not have been incurred but *65 for the existence of the capital transaction itself. Accordingly, we hold that the legal fees of $29,959.25 were expended in the creation of an asset (the lease), the useful life of which exceeded 1 year and were, therefore, nondeductible capital expenditures. Shutler v. United States,470 F.2d 1143, 1147 (10th Cir. 1972); Galt v. Commissioner,19 T.C. 892, 911 (1953), affd. in part and revd. in part 216 F.2d 41 (7th Cir. 1954), cert. denied 348 U.S. 951 (1955). By post-trial amendment to its petition, petitioner claims that Allied should be allowed to amortize a pro rata portion of the $29,959.25 in legal fees expended for the 25-year lease for the period between the closing date of the sale and leaseback transaction, June 15, 1967, and the date of disposition of the leasehold interest as part of the sale to Delaware, October 27, 1967. In this regard we agree with petitioner, and we hold that petitioner is entitled to deduct amortization prorated for such period based upon a 25-year life. Galt v. Commissioner,supra.
In its initial brief petitioner conceded that the $583.17 in legal fees expended *66 in the registration of a securities issue was a nondeductible capital expenditure. However, in the subsequent amendment to its petition and in its reply brief, it now claims that this amount should be deductible in full by Allied for its fiscal period ended December 31, 1967, on the theory that Allied would lose the benefit of this expenditure upon its liquidation. However, the record does not provide any support for this belated theory. The only information to be found in the record concerning the $583.17 in question is that it represented legal fees in connection with the registration of a securities issue. In the absence of evidence to the contrary, the reasonable inference is that the securities issue involved the acquisition of capital by the issuance of stock. Such costs of acquiring capital are not deductible or amortizable either during the life of the company or upon dissolution or liquidation. Davis v. Commissioner,151 F.2d 441, 443 (8th Cir. 1945), affg. 4 T.C. 329 (1944), cert. denied 327 U.S. 783 (1946); Pacific Coast Biscuit Co. v. Commissioner,32 B.T.A. 39, 42 (1935). In any event, in the absence of *67 evidence more specifically identifying the nature of the legal fees in question, we have no basis for allowing their deduction even upon Allied's liquidation on December 31, 1967. 4. Depreciation Recapture
Upon the sale of its assets to Delaware in 1967, Allied reported as recognizable gain $131,053 from depreciable property under the recapture provisions of sections 1245 and 1250. Subsequently, respondent adjusted Allied's income, recaptured from its depreciable property, upward by $564,256. In making such adjustment respondent refused to allow the gains realized with respect to the disposition of the furniture and fixtures to be offset by any loss which may have been realized with respect to the disposition of the leasehold improvements. [12]/ See BASF Wyandotte Corp. v. Commissioner,62 T.C. 704 (1974), affd. 532 F.2d 530 (6th Cir. 1976). *68 Petitioner has not challenged this major aspect of respondent's recomputation; however, petitioner contends that in Allied's original computation of reportable depreciation recapture certain assets were misclassified, resulting in an overstatement of the gain computed with respect to the furniture and fixtures. Specifically, petitioner maintains that included in the assets sold to Delaware were cafeteria equipment valued at $103,536 and a conveyor system valued at $80,973, whose combined value of $184,509 was erroneously included as part of the aggregate value of furniture and fixtures sold when in fact such items were leasehold improvements. On this ground, petitioner contends that the fair market value amount allocated to furniture and fixtures should be reduced by $184,509, with this amount, in turn, increasing the fair market value amount realized with respect to its leasehold improvements. Additionally, petitioner contends that the fair market value allocated to furniture and fixtures included the value of certain test equipment carried on Allied's books as inventory, the basis of which was not included in the aggregate adjusted basis of Allied's furniture and fixtures. *69 The parties have stipulated that if petitioner adequatlely proves that the foregoing items were misclassified as alleged, Allied's original computations with respect to the furniture and fixtures and the leasehold improvements should be recast as follows: Furniture and fixtures: Fair market value - per
original computation
$1,396,796
Less: Cafeteria equipment
(103,536)
Conveyor system
(80,973)
Corrected fair market value
$1,212,287
Net book value
Cost - per original
Computation
$1,187,695
Add: Test equipment
280,496
$1,468,191
Less: Reserve for depre-
citation
609,037
859,154
Gain on furniture and fix-
tures
$ 353,133
Leasehold improvements: Fair market value - per
original computation
$ 111,041
Add:
Cafeteria equipment
103,536
Conveyor system
80,973
Corrected fair market value
$ 295,550
Net book value cost
$1,288,960
Less: Reserve for depre-
ciation
490,834
798,126
Loss on leasehold improve-
ments
$ (502,576) It is further stipulated that on the basis of the foregoing, the correct amount of reportable income would be $353,133, and that, therefore, the correct adjustment to depreciation recapture would be *70 $222,080 ($353,133 less the originally reported amount of $131,053). [13]/ Upon examination of the record, including the stipulation of facts, the M & S appraisal report, certain accounting documents from Allied's files, and the testimony of two witnesses familiar with Allied's accounting during 1967, we have concluded that petitioner has adequately established the items in question were misclassified as alleged, and we have so found as ultimate facts. Accordingly, the correct adjustment to reported depreciation recapture is an increase of $222,080, adjusted under Rule 155, as may be required as described in footnote 13 above. 5. Net Operating Losses
The resolution of this issue is wholly dependent upon the final determination of certain of the other issues herein. Accordingly, the proper adjustments regarding the net operating loss deductions in question will be made *71 pursuant to the Rule 155 computation necessitated by the opinion. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. /↩ Subject to an unexplained discrepancy of 97 cents. The yearend balance for each respective year also represents the opening balance for the succeeding year. Since the "Overstock--Knight Division" account was first placed on Allied's books in the year ended July 28, 1967, upon Knight's liquidation, the opening balance of that account was treated in the statutory notice of liability as zero for this purpose. 3. Subject to an unexplained discrepancy of 17 cents.↩
4. /↩ The standard cost system, commonly used by retailers having varied inventories, is a method of estimating the cost of inventory by reference to certain predetermined "standard" costs, rather than the actual invoice costs, for the specific inventory items on hand. See Wixon, Accountants' Handbook, 12-47 (5th ed.)
1. /↩ The stated fair market values represent values assigned to the respective assets in the M & S appraisal.
4. A/ The absence of any value distinguishes TennesseeCarolina Transportation, Inc. v. Commissioner,65 T.C. 440↩ (1975).
5. / In Alphaco, Inc. v. Nelson,385 F.2d 244, 245 (7th Cir. 1967), the court explained the reason for this rule as follows: * * * It is our conclusion that the allowance of the costs incident to the sale of capital assets as an ordinary and necessary business expense deductible from ordinary income not only violates a principle which appears basic in the scheme underlying the income tax statute, but is also incongruous with the purpose for which Section 337 was enacted. * * *
The scheme of the income tax statute is that the cost of producing a given type of income is to be accorded the same tax character as the income produced--that related disbursements and receipts should be given consistent tax treatment. * * * * * * [To] permit the costs of selling the corporate assets to be deducted by the corporation as ordinary business expenses would frustrate the purpose for which Section 337 was enacted. ↩
6. Our original position was stated in Pridemark, Inc. v. Commissioner,42 T.C. 510 (1964), revd. 345 F.2d 35 (4th Cir. 1965), which was reversed in the fourth circuit. Subsequently, in Of Course, Inc. v. Commissioner,59 T.C. 146 (1972), revd. 499 F.2d 754 (4th Cir. 1974), we reexamined the issue and reaffirmed our original view on the merits but considered ourselves bound to follow the reversal in Pridemark because appeal of our decision would be to the same fourth circuit. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In the appeal of Of Course, Inc., the fourth circuit recognized the correctness of our view on the merits and reversed its prior position in Pridemark, ironically necessitating reversal of our Golsen↩-mandated holding. Appeal of our decision in the instant case would be to the fifth circuit, one of the circuit courts which has not yet ruled on this issue.
7. /↩ As used in this context the term "liquidation" refers to the winding up of corporate affairs and formal dissolution, and does not encompass the "liquidation," i.e., sale, of the corporate assets.
8. / The principle that an allocation of the expenses should be made where legal fees are incurred to quiet title and to collect accrued rents, for example, has been recognized in sec. 1.212-1(k), Income Tax Regs., as follows: Expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. Attorneys' fees paid in a suit to quiet title to lands are not deductible; but if the suit is also to collect accrued rents thereon, that portion of such fees is deductible which is properly allocable to the services rendered in collecting such rents. * * * [Emphasis added.] DeMink v. United States,448 F.2d 867, 869 (9th Cir. 1971); Spangler v. Commissioner,323 F.2d 913, 919-920 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Boagni v. Commissioner,59 T.C. 708, 713-714 (1973); Kelly v. Commissioner,23 T.C. 682, 688-689 (1955), affd. 228 F.2d 512↩ (7th Cir. 1956).
9. /↩ While an understatement of closing inventory for a taxable period reduces net income for such period, the same understated amount, as the opening inventory of the following taxable period, has the effect of increasing the net income of such following period. Thus, the net effect of consistent annual understatements of closing inventory is merely a continuous 1-year deferral of income. In computing his overall adjustments for each of the respective taxable periods here involved, respondent has offset the understatement of inventories determined as of the end of each period by the amount so determined as of the end of the preceding period.
10. /↩ Except with respect to "minus price variance" items which were effectively valued at the lower new standard cost.
11. /Sec. 1.471-2 Valuation of inventories. * * *
(c) The bases of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower. * * * Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition, whether subparagraph (1) or (2) of this paragraph is used, or if such goods consist of raw materials or partly finished goods held for use or consumption, they shall be valued upon a reasonable basis, taking into consideration the usability and the condition of the goods, but in no case shall such value be less than the scrap value. Bona fide selling price means actual offering of goods during price means actual offering of goods during a period ending not later than 30 days after inventory date. The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made.↩
12. /↩ The amount of reportable depreciation recapture cannot exceed the net gain from the sale of the assets involved. In this case respondent has determined that the amount of depreciation subject to recapture totals $695,309. Thus, the issue is whether the net gain from sale of the assets in question was a lesser amount.
13. /↩ It should be noted that this stipulated adjustment does not give effect to our holding above concerning the allocation of the expenses of the sec. 337 liquidating sale.Thus, a further adjustment to the income from depreciation recapture will be required in the computation under Rule 155.